John DOE, et al.

v.

**CONNECTICUT DEPARTMENT OF CHILDREN AND YOUTH SERVICES, et al.**

No. Civ. H–86–829 (PCD).

United States District Court,
D. Connecticut.

May 17, 1989.

Joseph D. Garrison, JoNel Newman, Garrison, Kahn, Silbert & Arterton, New Haven, Conn., for plaintiffs.

Daniel R. Schaefter, and Arthur E. Webster, Asst. Attys. Gen., Hartford, Conn., for defendants.

## RULING ON MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

DORSEY, District Judge.

Plaintiffs' action under 42 U.S.C. § 1983 against the Connecticut Department of

Child and Youth Services ("DCYS"); Mark Marcus, Commissioner of DCYS; Raymond Farrington, Director of Protective Services; Patricia Simpson, Social Work Supervisor; and David Goldner, social worker, alleges:

1. the emergency removal and temporary custody of John Doe without probable cause to believe he was in immediate danger was an unconstitutional seizure;

2. the placement of John Doe in a State Receiving Home unsuitable for children of his age and his conditions of confinement violated his substantive and procedural due process rights;

3. the intrusion into the Doe home without probable cause to believe John Doe was in immediate danger deprived the Doe family of its right to privacy without due process;

4. the removal of John Doe from his home was in violation of the directives of 42 U.S.C. § 671;

5. defendants Goldner, Simpson, and Farrington were negligent and in derogation of their constitutional, statutory and professional duties; and

6. the policies and regulations of DCYS as promulgated and enforced by defendant Marcus are unconstitutional.

Defendants move to dismiss or for summary judgment, claiming entitlement to absolute immunity or qualified immunity for their role in the emergency removal and temporary custody of John Doe; there is no implied cause of action under 42 U.S.C. § 671; and that pendent jurisdiction over plaintiffs' negligence claims should be declined.

## FACTS

In June 1984, J. observed her five-year old son, M.,* and his friend John Doe engaging in sexual play. J. took M. to see Dr. Rhoda Kreisman, Ph.D., a family and child psychotherapist, on June 27, 1984. On July 11, 1984, pursuant to Conn.Gen. Stat. § 17–38a(b), Dr. Kreisman reported to DCYS that M. had told her that John Doe's sixteen-year old brother, Tim, had sexual contact with him. The case was assigned to David Goldner by his supervisor, Patricia Simpson. On July 12, 1984, Dr. Kreisman expressed to Goldner her suspicions that both M. and John Doe had been sexually molested by Tim Doe.

On July 17, 1984, Goldner informed Mary Doe, mother of John and Tim, of the referral from Dr. Kreisman.[1] On that day, Goldner interviewed Tim Doe, who denied any sexual abuse. Upon learning of these allegations, the Does placed Tim in therapy with Dr. Harvey Rubin on July 27, 1984, and actively sought therapy for John. On July 18, 1984, Goldner interviewed John Doe alone and asserts that he confirmed Tim's sexual contact with him and M.

On August 1, 1984, Dr. Kreisman reported to Goldner that M. had now spoken of more serious acts of sexual abuse perpetrated on him by Tim Doe. Dr. Kreisman also advised that she wished to file a police report concerning the allegations about Tim Doe. Goldner did not interview M. at the request of Dr. Kreisman who felt it could be harmful to M. On August 8, 1984, Dr. Kreisman reported to Goldner that M. had related other incidents of sexual abuse by Tim and also that Mary Doe had caught them several times and slapped Tim.

On August 10, 1984, Dr. Kreisman notified the Meriden Police that M. had implicated the Doe parents in the sexual abuse of John, Tim, and M. and stated that Mary and Frank Doe had filmed the molestation and also held up a large knife and said they would use it if M. told anyone what happened. The Meriden Police relayed this information to the DCYS Care–Line, an after-hours emergency service, which informed Simpson and Goldner later that evening. Dr. Kreisman filed an affidavit from M., dated August 10, 1984, with the Meri-

---

* J. is the mother of M. They have been letter identified herein to preserve their privacy. They are not parties.

1. Mr. Goldner asserts that Mary Doe told him that Tim had been sexually abused by a babysitter and that she never leaves Tim with John Doe for fear of molestation. Mary Doe denies such a statement and claims that she told Goldner that she never allowed Tim to babysit for John because he was mentally impaired and she had concerns about how he would respond in an emergency.

den Police which related M.'s account of the sexual abuse at the Doe home and her own affidavit, dated August 11, 1984, stating her professional opinion that M.'s statement was reliable since, in her experience, five-year old children do not generally make up such explicit stories about sexual abuse and would not have such knowledge, except as a victim.[2]

Between August 10 through 13, 1984, Goldner was in contact with Dr. Kreisman and the Meriden Police regarding the August 10th report. Specifically, Dr. Kreisman expressed her opinion that the situation in the Doe home was extremely volatile and potentially dangerous to the Doe children.

On August 13, 1984, Simpson reviewed the information filed by Dr. Kreisman with Farrington, who authorized a 96–hour emergency removal, pursuant to Conn.Gen. Stat. § 17–38a(e), at about 2:30 p.m. On the same day, Judge Wendy Susco, of the Superior Court, issued a search warrant for the Doe home authorizing the seizure of video equipment and/or ropes or restraining devices. The Meriden Police and DCYS attempted to coordinate so as to search the home at the same time Goldner removed the children. At about 5:30 p.m., Goldner met the police at the Meriden Police Department and followed them to the Doe home to carry out the emergency removal. However, the Doe family was out and did not return home until approximately 8:00 p.m. At about 9:00 p.m., the Meriden Police arrived at the Doe home to execute the search warrant. At the Does' insistence, Goldner was called and he removed the children pursuant to Farrington's removal order. John Doe was placed in the State Receiving Home at Warehouse Point until placed with his maternal aunt on August 17, 1984. At the State Receiving Home, John Doe had daily supervised visits with his parents for 30–60 minutes.

2. Dr. Kreisman also filed a third affidavit which outlined M.'s statements in therapy regarding the alleged sexual abuse and expressed her opinion of the veracity of M.'s statements and that the situation in the Doe home was extremely volatile and potentially dangerous. Plaintiffs

On August 16, 1984, DCYS filed neglect petitions with the Superior Court for juvenile matters and sought ex parte orders of temporary custody pursuant to Conn.Gen. Stat. § 46b–129(b). Judge Susco signed same on that day. On August 23, 1984, after a show cause hearing, the order of temporary custody was continued in effect, but John was allowed to return home conditioned on DCYS access at reasonable hours and John being made available for evaluation. On October 30, 1984, following a favorable report by Barbara Nordhaus, of the Yale Child Study Center, DCYS' motion to dismiss the petitions for temporary custody without adjudication or prejudice.

DISCUSSION

A. *Absolute Versus Qualified Immunity*

Defendants argue they are absolutely immune with respect to the 96–hour emergency removal of John Doe, the application for temporary custody, and the temporary placement of John Doe at the State Receiving Home. Alternatively, defendants claim qualified immunity from those claims as a matter of law.

While 42 U.S.C. § 1983 imposes liability on "every person" who, under color of state law, deprives another of a constitutional right, state officials performing discretionary functions have been accorded immunity from § 1983 actions for damages. *Harlow v. Fitzgerald,* 457 U.S. 800, 806–07, 102 S.Ct. 2727, 2731–32, 73 L.Ed.2d 396 (1982). This immunity protects public officials from undue interference with their duties and from the chilling effects of potential liability. *Id.* at 806, 102 S.Ct. at 2731. Such immunity may be either absolute, precluding any action for damages, or qualified, shielding only performance of official duties which does not violate clearly established constitutional rights of which a reasonable person would have known.

assert that this statement, although dated August 13, 1984, was not filed with the police until August 15th. Goldner asserts between August 10 and 13 Dr. Kreisman then conveyed the contents of the August 13th affidavit to him.

Qualified immunity is the norm for executive officials, such as defendants. *Malley v. Briggs,* 475 U.S. 335, 340, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Absolute immunity, however, has been extended to executive officials performing functions closely associated with the judicial process, i.e., prosecutors and officials performing functions intimately associated with judicial proceedings. *See Briscoe v. LaHue,* 460 U.S. 325, 335, 103 S.Ct. 1108, 1115, 75 L.Ed.2d 96 (1983); *Imbler v. Pachtman,* 424 U.S. 409, 424–26, 96 S.Ct. 984, 992–93, 47 L.Ed.2d 128 (1976). The ramifications of absolute immunity justify it only when required by considerations of public policy. The official seeking absolute immunity bears the burden of showing that public policy requires such immunity. *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978).[3]

Absolute immunity for child welfare workers has been based on two theories. First, the initiation of child abuse or custody proceedings has been found to be analogous to that of a prosecutor who is cloaked with absolute immunity. *Imbler,* 424 U.S. at 420, 96 S.Ct. at 990, *et seq.; Dacey v. Dorsey,* 568 F.2d 275, 278 (1978); *see, e.g., Meyers v. Contra Costa County Dept. of Social Serv.,* 812 F.2d 1154, 1156–57 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987) (responsibility of child services workers for bringing dependency proceedings, and the discretion to determine when to bring such proceedings, found to be analogous to the function of a prosecutor). Absolute immunity has also been based on reasoning that such immunity is necessary to allow for proper investigation and intervention in cases of suspected child abuse. *See, e.g., Mazor v. Shelton,* 637 F.Supp. 330 (N.D.Cal.1986); *Whelehan v. County of Monroe,* 558 F.Supp. 1093 (W.D.N.Y.1983).

The Second Circuit has declined to extend absolute immunity to all phases of processing child abuse complaints. *Robison v. Via,* 821 F.2d 913, 919–20 (2d Cir. 1987). The "strong emotional response provoked in anyone hearing an allegation of child abuse" counseled against absolute immunity for taking a child into custody. *Id.* at 920. Qualified immunity was found to strike the better balance between the state's interest in protecting children from abuse and the family's right to privacy. *Id.; see also Hodorowski v. Ray,* 844 F.2d 1210, 1215–16 (5th Cir.1988).

Defendants nonetheless contend that their challenged actions are sufficiently analogous to the prosecutorial function to be accorded absolute immunity. Plaintiffs allege that the emergency removal of John Doe and defendants' subsequent decision to seek an ex parte order of temporary custody without reasonable grounds to believe John Doe was in danger from his parents rendered his seizure unconstitutional. Plaintiffs thus argue that this is not an initiation of custody proceedings and thus not analogous to the prosecutorial function.

The Ninth Circuit cloaked child services workers with absolute immunity in the quasi-prosecutorial function of initiation and pursuing dependency petitions in cases of suspected child neglect and abuse. *Meyers,* 812 F.2d at 1157. The court recognized that the social worker must make a quick decision, not always based on complete information, when they initiate proceedings against parents who may have abused their children. *Id.* at 1157. This is warranted by the extreme risks of irreversible destruction of children if they are not removed from abuse. The judicial proceedings that follow the filing of a neglect petition gives aggrieved parents an opportunity to challenge the petition and correct any errors before their children are removed permanently or for a protracted period. *See Butz,* 438 U.S. at 512, 98 S.Ct. at 2913; *Pepper v. Alexander,* 599 F.Supp. 523, 526 (D.N.M.1984); *see also Czikalla v.*

---

**3.** The following factors are relevant to whether state officials should have absolute immunity: the need to assure performance of official functions without harassment or intimidation; other safeguards that reduce the need to control improper conduct by damage awards; the adversary nature of the process; and the correctability of error on review. *Cleavinger v. Saxner,* 474 U.S. 193, 202, 106 S.Ct. 496, 501, 88 L.Ed.2d 507 (1985), citing *Butz,* 438 U.S. at 512, 98 S.Ct. at 2913.

*Malloy,* 649 F.Supp. 1212, 1215 (D.Colo. 1986) (absence of mechanism to control possible misconduct of social workers in removing children from home made absolute immunity unsuitable).

Defendants removed John Doe pursuant to Conn.Gen.Stat. § 17–38a(e), which authorizes DCYS to remove a child without court order where there exists probable cause to believe that the child is "in immediate physical danger from his surroundings, and that immediate removal from such surroundings is necessary to insure the child's safety." In addition, "[s]uch removal and temporary custody shall not exceed ninety-six hours during which time either a petition shall be filed with the Superior Court or the child shall be returned to his parent or guardian." Conn.Gen.Stat. § 17–38a(e). Such a removal is more closely analogous to a police officer making a warrantless arrest based on probable cause and exigent circumstances. *See Malley,* 475 U.S. at 341, 106 S.Ct. at 1096 (police officer not entitled to absolute immunity from suit alleging an unconstitutional arrest based on a complaint and supporting affidavit which failed to establish probable cause). In circumspectly guarding absolute immunity, it is not extended to the office, but to the function and thus a prosecutor, when investigating, is not absolutely immune because that function is not " 'intimately associated with the judicial phase.' " *Robison,* 821 F.2d at 918, quoting *Imbler,* 424 U.S. at 430, 96 S.Ct. at 995. Thus, the claims here must be discussed separately, first the emergency removal.

■ The removal was accomplished under statutory authority. It was not investigative. It constituted an abrogation of rights. It involved at least a quasi-adjudication because it required a determination by Marcus of "probable cause to believe" the child was in danger before authorizing the child's removal without the consent of the parents. Conn.Gen.Stat. § 17–38a(e). Yet, the police officer determines probable cause in a warrantless arrest which abrogates rights and he is not accorded absolute immunity. On the basis of the better reasoning and the probability that this circuit, which has not decided the issue, would not find a child care worker's statutory emergency removal protectable by absolute immunity, defendants are not entitled to absolute immunity. Their function in this respect is not so intimately associated with the adjudicative process to be similarly immunized.

■ In addition, the decision to seek an ex parte order for temporary custody pursuant to Conn.Gen.Stat. § 46b–129(b) is also not sufficiently analogous to a prosecutorial function to warrant absolute immunity. Although a petition initiates a judicial proceeding and the judge can order temporary custody, a hearing is required to determine if there is reasonable cause to find that the child's condition or circumstances require that his custody be immediately assumed to safeguard his welfare. DCYS custody would continue pending a hearing on the petition. The ex parte temporary custody order is based upon a court finding of "reasonable cause" based on the affirmations in the petition. This conduct is analogous to the request of a police officer to a judge for an arrest warrant based on a complaint and supporting affidavit. *See Austin v. Borel,* 830 F.2d 1356, 1361 (5th Cir.1987). Plaintiffs challenge the issuance of the ex parte temporary custody hearing based on affirmations that John Doe was in danger. The balancing of the delicate and substantial interests [4] at stake can adequately be achieved by the grant of only qualified immunity, which would subject a removal of a child from the parents' custody to judicial review of its objective reasonableness. *Robison,* 821 F.2d at 920; *see also Malley,* 475 U.S. at 342, 106 S.Ct. at 1097 (the proper role of a court is not to make policy choices in determining the proper degree of immunity due

---

**4.** Preservation of the integrity of the family unit is a clear and proper concern of the community. Yet, it cannot be exalted to the disregard of the abuse visited upon children, often to an eggregious if not life threatening degree. Children are abused and destroyed within the family unit and by other members of the family. Properly the community should stand ready to respond to substantiated threats to children, even if the response does not preserve that integrity.

a particular official). Accordingly, defendants are not entitled to absolute immunity as to any of plaintiffs' claims.

## B. *Qualified Immunity*

 Qualified or "good faith" immunity protects government officials performing discretionary functions from liability to the extent that their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. The doctrine protects public officials from the risk of potentially ruinous monetary liability which would deter qualified people from public service and safeguards the public interest in having government employees act with independence and without fear of consequences. *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Qualified immunity accommodates the community's interest in the proper discharge of the officer's duties and an individual's right to redress for a government official's unconstitutional conduct. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096. "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson,* 107 S.Ct. at 3038, quoting *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39.

 An official can establish his entitlement to qualified immunity in three ways. *Walsh v. Franco,* 849 F.2d 66, 69 (2d Cir.1988). First, "the defense should be sustained if the court finds that it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution." *Robison,* 821 F.2d at 920. Second, "even if the interest asserted by the plaintiff was clearly of a type generally protected by federal law, the defendant is entitled to immunity as a matter of law if it was not clear at the time of the acts at issue that an exception did not permit those acts." *Id.* at 921. Third, "even if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him to believe his acts did not violate those rights." *Id.*

 Plaintiffs assert that the removal of John Doe from his home without probable cause to believe he was in immediate danger constituted an unreasonable seizure, a deprivation of liberty without due process and in violation of 42 U.S.C. § 671. Plaintiffs also contend that John Doe's placement at the State Receiving Home violated his substantive and procedural due process rights and that the intrusion into the Doe home without probable cause to believe John Doe was in immediate danger deprived the Doe family of its rights to privacy and integrity. The Supreme Court has recognized that an important consideration in deciding whether an official has violated clearly established law is the generality of the statement of the relevant rule. Many constitutional rights, such as the right to due process of law, are clearly established, but also so general that it often will be unclear whether particular conduct violates the right. *Anderson,* 107 S.Ct. at 3038–39. Accordingly, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 3039.

Defendants argue that it was objectively reasonable for them to believe that the emergency removal and placement of John Doe was justified under the circumstances and that, therefore, it was reasonable for them to believe that their actions violated no federal rights. Such a determination is fact specific. Summary judgment is appropriate where "the defendant[s] 'adduce suf-

ficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendants' to believe that [they were] acting in a fashion that did not clearly violate an established federally protected right." *Robison,* 821 F.2d at 921, quoting *Halperin v. Kissinger,* 807 F.2d 180, 189 (D.C.Cir.1986). For example, a police officer sued under § 1983 for false arrest would be entitled to qualified immunity if the undisputed facts show either "(a) that it was objectively reasonable for the officer to believe that probable cause existed, or (b) that officers of reasonable competence could disagree on whether the probable cause test was met." *Robison,* 821 F.2d at 921. Thus, an officer would not be entitled to summary judgment only if the record would sustain a jury finding that the officer could not reasonably have believed that the conduct would not have violated plaintiffs' rights.

The intrusion of the state into the integrity and privacy of the family implicates fundamental constitutional rights. *See Stanley v. Illinois,* 405 U.S. 645, 649, 92 S.Ct. 1208, 1211, 31 L.Ed.2d 551 (1972). These rights encompass the parents' interests in the companionship, custody and care of their children and those "of the children in not being dislocated from the 'emotional attachments that derive from the intimacy of daily association' with the parent." *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977), quoting *Smith v. Organization of Foster Families,* 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977). However, it is also "well established that officials may temporarily deprive a parent of custody in 'emergency' circumstances 'without parental consent or a *prior* court order.' " *Robison,* 821 F.2d at 921, quoting *Duchesne,* 566 F.2d at 826. *See also Myers v. Morris,* 810 F.2d 1437, 1462 (8th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987) (constitutionally

protected interest in family relations is limited by compelling government interest in protection of minor children, particularly in circumstances where protection may be necessary as against the parents themselves).

In this case, whether defendants are entitled to qualified immunity turns on the reasonableness of their belief that a sufficient emergency existed to warrant taking John Doe into temporary custody. This analysis is not one of hindsight, but rather is determined by defendants' action "in the context of 'the circumstances with which [the official] was confronted.' " *Giacalone v. Abrams,* 850 F.2d 79, 85 (2d Cir.1988), quoting *Anderson,* 107 S.Ct. at 3039.

The emergency removal of John Doe required "probable cause" to believe that he was in immediate physical danger from his surroundings and that removal was necessary to insure his safety. Reports of child abuse must be investigated immediately by the agency receiving such report. This statute, as well as Conn.Gen.Stat. § 46b–129(b), have been upheld as constitutional, as the statute limits intervention to cases where the state interest is compelling, i.e., where "immediate physical danger" is present. *In re Juvenile Appeal,* 189 Conn. 276, 287, 455 A.2d 1313 (1983).[5]

Defendants assert that their belief that John Doe was in danger either from his parents or from which his parents would not protect him was objectively reasonable based on their knowledge at the time. DCYS had Dr. Kreisman's report that M. had reported being sexually abused by Tim Doe, the oldest son of the Doe family. John Doe confirmed Tim's sexual contact with him and M. The Doe parents were noted then to be cooperative and immediately to have sought therapy for their sons. Dr. Kreisman reported that M. had related further incidents of abuse by Tim Doe of which Mary Doe had been aware. Further, on Friday, August 10, 1984, Dr. Kreisman reported that M. had indicated that the Doe

---

**5.** The ABA standards relating to abuse and neglect were found to be helpful in interpreting the "at risk" standard of Conn.Gen.Stat. § 17–38a(e), which includes whether "a child

has been sexually abused by his/her parent or a member of his/her household." 189 Conn. at 289–90 n. 12.

parents had participated in the sexual abuse of John Doe, as well as M. Goldner confirmed Dr. Kreisman's opinion that children of M.'s age do not fabricate such stories without having either experienced or seen such sexual activity. Dr. Kreisman also expressed her opinion that the Doe children were in danger of continued sexual abuse. This information was conveyed by Simpson to Farrington, who relied on Dr. Kreisman's reputation and experience in dealing with child sex abuse cases when he authorized the 96-hour removal.

Plaintiffs assert that issues of fact exist regarding the reasonableness of the emergency removal based on the propriety of defendants' reliance on Dr. Kreisman's opinion as to the veracity of M.'s allegations. Plaintiffs contend that Dr. Kreisman's sessions with M. were therapeutic and not to determine the truth of his reports of sexual abuse. Defendants first received the information implicating the Doe parents on August 10, 1984. However, John Doe was not removed until August 13, 1984, from which plaintiffs would infer the removal was not necessary to protect John Doe from immediate physical danger. Other than contacting Dr. Kreisman and the Meriden Police, the record does not reflect any other investigation of Dr. Kreisman's reports of August 10th. Defendants were requested by Dr. Kreisman, for medical reasons, not to interview M., a request which was honored. Plaintiffs claim that the absence of such investigation before the removal was unreasonable. Plaintiffs assert that defendants could have contacted the Doe parents and attempted to re-interview John Doe in the three-day period prior to the removal. *See Robison*, 821 F.2d at 922 (removal objectively reasonable as a matter of law where spontaneous reactions of children suggested that they feared immediate reprisal from stepfather); *Hodorowski*, 844 F.2d at 1217 (temporary removal reasonable as a matter of law where case workers examined children and found serious bruises confirming report of abuse). Goldner had not noted any manifestation of sexual abuse in his interview of John Doe. The Doe parents seemed to be concerned and cooperative. Plaintiffs also contend that it was unreasonable to place John Doe in a State Receiving Home without considering alternate measures, such as supervised in-home custody or placement with a relative pending adjudication. *See* Conn.Gen.Stat. § 17–38a(e). Plaintiffs' arguments benefit from hindsight. They do not contradict the facts on which defendants relied. They argue that defendants should not have inferred a risk of immediate danger from those facts and should have investigated further.

Consideration of a motion for summary judgment requires that all reasonable inferences be drawn in favor of plaintiffs. Based solely on the facts known to defendants, and on which they acted, a rational jury could not find it was objectively unreasonable for defendants to believe that John Doe was the object of ongoing sexual abuse, or that his removal was necessary to protect him from immediate physical danger. The question is whether defendants could be found to have acted with an unreasonable belief that the removal would not violate plaintiffs' rights. Even with the benefit of all reasonable inferences, it is held that defendants could not be so found. Further investigation could result in delay during which the described abuse could have continued. Any repetition of the abuse would be destructive of John Doe and probably irretrievably so. Not only did the information suggest the abuse of John Doe, but the parents' failure to stop it if they were not actual participants. The removal prevented repetition, a reasonable likelihood based on what defendants knew. Defendants were entitled to qualified immunity. Their action was "taken to prevent harm" to John Doe. *Robison*, 821 F.2d at 919, citing Restatement (Second) of Torts § 156 (1965). Thus, they are insulated "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738; *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed. 2d 411 (1985). This record does not permit

a finding that it was not "objectively reasonable for [defendants] to believe that [their] acts did not violate [plaintiffs'] rights." *Robison,* 821 F.2d at 921. They knew of the reports of Dr. Kreisman's patient that he and John Doe had been abused by Tim Doe. While the Doe parents reacted appropriately to the immediate confrontation by Goldner, there was no acknowledgement of a prior awareness of such abuse. Yet Dr. Kreisman subsequently reported that Mrs. Doe had come into the presence of occasions of abuse. Until confronted, the Does had taken no corrective action. John Doe confirmed the abuse. Then it was reported that the Does were present or participated in the abuse. While it was not absolutely established that there was ongoing abuse, there was a reasonable basis to believe that there was ongoing abuse which would have had disastrous consequences to any child subjected to such. While plaintiffs suggest defendants should have gone further, that is exactly the hindsight which would deter an honest official from acting. To say that a jury, on this record, could find that defendants violated plaintiffs' rights would mean that, if a jury did so, defendants, on this record, would be liable. That is not what qualified immunity is intended to protect against. Such a finding would inhibit a comparable official, in the same circumstances, and cause him/her to refrain from acting to protect a child who is at risk. Such inhibition is not in the interest of the community. Only if defendants acted in clear defiance of plaintiffs' rights should they be liable. Plaintiffs may be correct that there may not have been ongoing abuse, but that is not the question. The possibility that there was no abuse must give way to protection of the child where a reasonable basis exists for the belief that such protection is necessary. "[I]t was objectively reasonable for [defendants] to believe they violated no federal rights" when they petitioned for and effectuated the removal of John Doe. *Robison,* 821 F.2d at 921. The threat to a child's safety is "justification enough for action first and a hearing afterward." *Lossman v. Pekarske,* 707 F.2d 288, 291 (7th Cir.1983).

*See also Robison,* 821 F.2d at 921, and cases there cited. It "is sufficient if the officials have been presented with evidence of serious ongoing abuse and therefore have reason to fear imminent occurrence." *Id.* at 922. As with defendants in *Robison,* defendants here had an objectively reasonable basis, i.e., there was credible evidence, to believe that John Doe was at risk, if not from his brother without the protection of his parents, then with their acquiescence. Plaintiffs' rights were only temporarily to be abrogated. Judge Susco found the information warranted removal. John Doe's confirmation of the abuse at his brother's instance could well be seen as not being corrected by parents who failed to acknowledge what they seemingly knew was happening, failed to take corrective steps until confronted, and may have participated in or condoned the abuse. At least defendants, in protecting John Doe, could reasonably have believed such was the case.

As it is found that no reasonable juror could find that it was not objectively reasonable for defendants to have acted as they did in petitioning for and removing John Doe in the belief that he was then subject to ongoing abuse, defendants are entitled to summary judgment.

■ Plaintiffs' separate claim that placing John Doe as defendants did was also a violation of his rights is without merit. They offer no evidence to suggest that what defendants did was unreasonable under the circumstances. They merely offer evidence of alternatives that were not investigated or considered. The question is not whether defendants acted on the best of the alternatives, but in a manner that was reasonable considering the timing and emergency nature of the removal, as well as the inability to adequately investigate alternatives on such short notice. John Doe was placed with his maternal aunt on August 17, 1984, four days after the emergency removal, after defendants interviewed family members for placement and determined that the aunt's home was a suitable environment. The existence of other, possibly better, alternatives for placement does not make their placement

unreasonable. Further, there is no evidence in the record to support plaintiffs' allegations that John Doe was "essentially in solitary confinement" and treated "virtually as a prisoner." As there is no basis to find defendants' placement was unreasonable, defendants are also entitled to summary judgment on this claim.

On the basis of their entitlement to qualified immunity under the circumstances in which they acted in this case, defendants' motion for summary judgment is granted.

The finding of defendants' entitlement to qualified immunity is dispositive of all of plaintiffs' specific claims and renders unnecessary a determination of the more general claim of unconstitutionality of the DCYS' policies and regulations under which defendants herein acted.

SO ORDERED.

