Evelyn DeROSA, Plaintiff,

v.

**Wesley BELL, et al., Defendants.**

No. 3:94CV1616(JBA).

United States District Court,
D. Connecticut.

Aug. 31, 1998.

William F. Dow, III, David T. Grudberg, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT, for Plaintiff.

Susan Quinn Cobb, Attorney General's Office, Stephen G. Vitelli, Attorney General's Office, Health & Human Services, Carolyn Kyle Querijero, Attorney General's Office, Special Litigation, John Essex Tucker, Attorney General's Office, Michael J. Besso, Attorney General's Office, Child Protection, Hartford, CT, for Defendants.

**Ruling on Defendants' Motions
for Summary Judgment
[docs. # 29, # 34]**

ARTERTON, District Judge.

Evelyn DeRosa, the owner of the Linden Nursery School ("Linden"), brings suit for violations of her civil rights against various officials of the Department of Public Health and the Department of Children and Fami-

lies,[1] for their roles in the September 1991 summary suspension of DeRosa's license to operate the day care center.

Defendants Bell, Lewis, and Addiss move for summary judgment on the grounds of absolute immunity, or in the alternative, qualified immunity [doc. #29]. Defendants Hartman and Ahearn move for summary judgment solely on the grounds of qualified immunity [doc. #34].

## Factual Background

Previous to the events at issue in this case, plaintiff's day care business had been in continuous operation for approximately 17 years. In August 1991, the Meriden Police Department received complaints from parents of children enrolled at the Linden Nursery School alleging abuse and neglect by teachers at the school. Pursuant to state statute, the police department notified the DCF, which in turn notified the DOPH, as the day care center licensing authority. DCF commenced an investigation into the allegations in conjunction with the Meriden Police Department.

At the time of the disputed events, an interagency agreement provided for the exchange of information and cooperative work arrangement whenever allegations of suspected abuse or neglect were received involving a day care center. Under this agreement, the primary responsibility for the investigation rested with DCF, and at the conclusion of the investigation, DCF would give DOPH a written report, which would include DCF's findings and conclusions as to whether abuse or neglect had occurred. DOPH had the responsibility and authority to review the DCF investigation report, consider the information provided, and make the determination of whether a license should be suspended or revoked, and

whether such suspension or revocation should be executed summarily or after notice and a hearing.[2]

Defendant Margaret Hartman was the social worker who participated in the investigation on behalf of DCF, and defendant Maria Ahearn was her program supervisor. Before the investigation was assigned to Hartman, social worker supervisor David Johnson had classified the referral as an emergency. As part of the investigation, Hartman along with members of the Meriden Police Department interviewed two of the children who had allegedly been subject to abuse or neglect at the day care, as well as four teachers at the school. The two children interviewed apparently reported to Hartman and the police that children had been hit by staff, a child had been told he would be locked in a sleep room alone, a child's mouth had been taped shut for being noisy, and a child had been locked in a shed. A staff member at the school, Patricia Thadieo, corroborated certain of the children's claims and added her own allegations, many of which were quite serious.

At the conclusion of the DCF investigation, defendant Wesley Bell, the DOPH day care licensing supervisor, received the report, in which the DCF recommended that "the license of Linden Day Care/Nursery School be revoked in that children under their care were abused and/or neglected."[3] (Def.'s Ex. D). Defendants Bell and Lois Lewis, DOPH Director of the Community Nursing and Home Health Division, reviewed the DCF report, along with a copy of the Meriden Police report. Relying on the information in those reports as accurate and complete, Bell and Lewis relayed the information to Lewis' direct supervisor, Stephen Harriman, who is now Commissioner of DOPH, but at the time of these events was Bureau Chief of the

---

**1.** Subsequent to the events at issue in this case, The Department of Health Services changed its name to the Department of Public Health ("DOPH"), while the former Department of Children and Youth Services changed its name to the Department of Children and Families ("DCF"). Consistent with the practice of the litigants, the current names are used throughout.

**2.** Connecticut General Statutes § 4–182 states that:

If an agency finds that public health, safety or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action.

**3.** The DCF report made no recommendation as to whether any license revocation should be made summarily, or after a hearing.

Bureau of Health System Regulations. Lewis, Harriman, and Bell agreed that an emergency situation existed that affected the health, safety or welfare of the children at Linden, and recommended to defendant Susan Addiss, the Commissioner of DOPH, that license revocation proceedings be initiated and an interim suspension of the plaintiff's license be ordered pending a full and prompt hearing on the charges. The summary suspension order was signed on September 23, 1991, and on September 24, 1991, the facility was closed pending a hearing on the charges.

After the license was summarily revoked, a hearing officer concluded that Thadieo was not a credible witness based upon her demeanor and changing and inconsistent story. The hearing officer ultimately absolved the day care center of all the charges except the one that staff members had "failed to appropriately supervise" one of the children in an incident leading to that child falling and injuring himself. Although a "serious" incident of non-compliance with the applicable regulations, the hearing officer determined that continued suspension of the license was not warranted. The Commissioner of DOPH adopted the hearing officer's decision, with only one minor change.

The plaintiff then filed suit against the defendants, alleging that the summary suspension of her license violated her constitutional due process rights under the Fourteenth Amendment. Defendants Bell, Lewis and Addiss contend that they are protected by the doctrine of absolute immunity, or in the alternative qualified immunity. Defendants Hartman and Ahearn argue that they are protected by the doctrine of qualified immunity.

## Legal Standard

A party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142, (1970). When a court is confronted with facts that permit several different conclusions, all inferences from the underlying facts must be drawn in the non-movant's favor. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995). The trial court must bear in mind that "[c]redibility determi-

nations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If the movant demonstrates an absence of material issues of fact, a limited burden of production shifts to the non-movant, which must "demonstrate more than 'some metaphysical doubt as to the material facts, ... [and] must come forward with specific facts showing that there is a genuine issue for trial.' " *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993) (citations and emphasis omitted). Summary judgment, then is granted only when "there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), or, in other words, only if "no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). The trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Id.*

## Absolute Immunity

Defendants Bell, Lewis, and Addiss ("the DOPH defendants") move for summary judgment on the grounds of absolute immunity. Qualified immunity is the extent of immunity usually applied to executive officials, such as defendants. *See Malley v. Briggs*, 475 U.S. 335, 340, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). "Absolute immunity, however, has been extended to executive officials performing functions closely associated with the judicial process, i.e., prosecutors and officials performing functions intimately associated with judicial proceedings." *Doe v. Connecticut Dep't of Children and Youth Services*, 712 F.Supp. 277, 281 (D.Conn.1989) (citations omitted). "[T]raditional common law immunities include a prosecutor's absolute immunity from claims for damages arising out of prosecutorial duties that are inti-

mately associated with the judicial phase of the criminal process." *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir.1996) (citations omitted).

■ Whether an official is entitled to absolute or qualified immunity depends on the nature of the official's functions at issue. "[I]mmunity is justified and defined by the functions it protects and serves, not by the persons to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). In *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court explained the safeguards "built into the judicial process" that tend to reduce the need for private damages actions:

> The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious actions by judges.... Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decision making process, there is a less pressing need for individual suits to correct constitutional error.

*Id.* at 512, 98 S.Ct. 2894. Subsequent courts have culled from the *Butz* rationale four factors relevant to the absolute immunity inquiry: 1) the need to assure performance of official functions without harassment or intimidation; 2) other safeguards that reduce the need to control improper conduct by damage awards; 3) the adversary nature of the process; and 4) the correctability of error on review. *See Doe v. Connecticut Dep't of Children and Youth Services*, 712 F.Supp. 277, 281 n. 3 (D.Conn.1989), *aff'd* 911 F.2d 868 (2d Cir.1990), (*citing Cleavinger v. Saxner*, 474 U.S. 193, 202, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985)).

■ In this Court's ruling on these same defendants' motion to dismiss on absolute immunity grounds, the Court observed that defendant Addiss' conduct "appears more akin to judicial conduct in issuing orders to show cause and temporary restraining orders on the basis of *ex parte* presentations by a party in a civil matter." [4] Ruling of Sept. 30, 1996 at 3. In their motion for summary judgment, the defendants, quoting out of context the Court's ruling on the motion to dismiss, seize upon the argument that Addiss was acting in a judicial capacity, and that her staff is entitled to the same immunity for their actions in assisting her, citing *Hill v. City of New York*, 45 F.3d 653, 660 (2d Cir.1995). Alternatively, the defendants claim that they are entitled to quasi-prosecutorial immunity.

In arguing for judicial immunity, the defendants reason that the summary suspension was commenced pursuant to Conn. Gen. Stat. § 19a–84, which provides for the right to a hearing, and the subsequent hearing in this case was conducted according to the procedural protections provided by the Conn. Gen. Stat § 4–166 et seq., which include notice of the hearing and statement of the charges, the right to inspect the relevant material, the right to present evidence at a hearing and cross-examine witnesses before an unbiased hearing officer, and the right to appeal an adverse decision. Thus, the defendants conclude, these provisions are similar to the available remedies that the Supreme Court held adequate to justify absolute immunity in *Butz*. Such an argument, however, merges the stages of the proceedings commenced against the plaintiff, and the functional roles of the defendants during each stage of the proceedings. Defendants base their quasi-judicial immunity argument in large part on the protections afforded to the plaintiff during the hearing stage of the proceeding, and its similarities to a judicial proceeding. However, the subsequent hearing, with its attendant judicial proceeding-like features, is not the contested aspect of defendants' actions; it is the defendants' participation in summarily suspending the license that is the subject of the absolute immunity inquiry. "[W]hether non-judicial officers

---

**4.** The Court's statement was made in the context of comment on the inadequate record supporting defendants' assertion of quasi-prosecutorial immunity in their motion to dismiss.

merit quasi-judicial absolute immunity depends upon the functional comparability of their judgments to those of a judge." *Young v. Selsky,* 41 F.3d 47, 51 (2d Cir.1994) (citations omitted). The summary suspension stage of the proceeding was effected pursuant to Conn. Gen.Stat. § 4–182, which unlike Conn. Gen.Stat. § 19a–94 does not entitle the plaintiff to any of the safeguard features that make the hearing stage facially similar to a judicial proceeding. The record shows that at the summary suspension phase, the Commissioner made her decision based on a report prepared by a sister agency and reviewed by her staff, a police report, her staff members' recommendations and the sworn statement of one witness, obtained by one of the staff members. In contrast to the hearing phase, there was no calling of witnesses, the plaintiff was not allowed the opportunity to respond or given the opportunity to be represented by counsel. The defendants liken the procedure to a judge issuing an *ex parte* temporary restraining order. This is a flawed analogy, however, in that the materials on which the decision were based were not brought before the Commissioner by an independent party seeking an adjudication, but rather by her own staff, who received the information through an interagency information sharing agreement.[5] Many officials make decisions based on information brought before them, without the benefit of hearing from an opposing party, such as a police officer making an arrest after a determination of probable cause, but this does not transform an executive action into a judicial action. The *ex parte* TRO is a particularly misleading example because it is one of the few judicial actions that is not subjected to the rigors of adversary process. In the absence of adversary process, however, judges are nevertheless restrained by other aspects of the judiciary that safeguard the process, such as the insulation of the judge from political influence and the importance of precedent in resolving controversies, *see Butz,* 438 U.S. at 512, 98 S.Ct. 2894, and the strict time limits that govern *ex parte* TRO's.

These other safeguards are missing from the Commissioner's decision on the summary suspension.

In the alternative, the defendants also claim quasi-prosecutorial absolute immunity, likening their action in initiating the administrative proceeding to a decision by a prosecutor to initiate a criminal proceeding. *See Moran v. Connecticut Dept. of Public Health and Addition Services,* 954 F.Supp. 484 (D.Conn.1997) (commissioner of department of public health entitled to prosecutorial immunity for actions in moving to suspend a doctor's license). The defendants again merge two aspects of the process. Assuming for the sake of argument that initiation of administrative proceedings is sufficiently prosecutorial to merit absolute immunity, it is not the initiation of proceedings that is at issue, but rather the subsequent decision to summarily suspend the license. These are two distinct events, illustrated by the fact that initiation of the proceedings could have taken place without summary suspension of the license. The prosecutorial analogy as to the decision to suspend the license is flawed for the reason that while a prosecutor can initiate a proceeding seeking a certain sanction, the prosecutor cannot also act to impose the sanction sought. *C.f. Hill,* 45 F.3d at 661 (assistant district attorney entitled to absolute immunity for prosecuting case, but not entitled to absolute immunity for directing that a child be removed from the home).

Finally, the defendants suggest that the importance of their roles in protecting children is as important as the prosecutor's responsibility for child protection in the criminal context, and that therefore the decisions stemming from fulfilling that responsibility should be accorded the same protections. The assertion that the child protection role in general be accorded absolute immunity has been rejected by the Second Circuit in *Robison v. Via,* 821 F.2d 913 (2d Cir.1987), in the context of the seizure without a court order of children in danger of abuse. The parties in *Robison* did not succeed "in persuading [the Second Circuit] that the official investi-

---

5. While the subordinates who brought the information before Addiss could be cast in the role of independent parties or prosecutors bringing a case before a judge, the defendants themselves argue that their actions were intimately connected to the judicial process, such as a law clerk or probation officer, and thus are cloaked by judicial immunity.

gation of alleged child abuse is a function so sensitive as to require a total shield from judicial review or that it cannot be performed properly unless all scrutiny is denied." *Id.* at 919. *See also Doe,* 712 F.Supp. at 281.

For the above reasons, the Court finds that the DOPH defendants are not entitled to absolute immunity for their actions in summarily suspending Linden's license.

## Qualified Immunity

All defendants move for summary judgment on the grounds of qualified immunity. Plaintiff resists their motions for summary judgment by arguing that a factual dispute exists as to whether an emergency situation existed at Linden at the time of the summary suspension. Given this factual dispute, the plaintiff contends, it is not possible to resolve whether the defendants acted in compliance with Conn. Gen.Stat. § 4–182(c), which requires that an emergency exist before a summary license suspension may be effected, such that it can be determined whether the defendants violated clearly established rights of the plaintiff or if the actions of the defendants were objectively unreasonable.

■ The defense of qualified immunity shields governmental officials from civil liability if the officials' conduct did not violate constitutional rights that were clearly established at the pertinent time or if it was objectively reasonable for the officials to believe that the conduct did not violate such rights. *See Cecere v. City of New York,* 967 F.2d 826 (2d Cir.1992) (citations omitted). "The qualified immunity defense is intended to 'strike a fair balance between (1) the need to provide a realistic avenue for vindication of constitutional guarantees, and (2) the need to protect public officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" *Lee v. Sandberg,* 136 F.3d 94, 100 (2d Cir.1997) (*quoting Jemmott v. Coughlin,* 85 F.3d 61, 66 (2d Cir. 1996)). A party is entitled to summary judgment on qualified immunity grounds if the court finds that the rights asserted by the plaintiff were not clearly established or:

no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ] to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Robison,* 821 F.2d at 921 (citations and internal quotations omitted).

The constitutional violation alleged in this case is the deprivation of property without due process of law. While the right to due process is clearly established under the fourteenth amendment, the issue of qualified immunity cannot be resolved at such a high level of generality. *See Anderson v. Creighton,* 483 U.S. at 639, 107 S.Ct. 3034. Instead, the question for our determination is whether, in light of clearly established law and the circumstances of this particular case, reasonable officers would have known that it was not lawful for them to suspend Linden's license without prior notice and an opportunity for Linden to respond absent an emergency situation, and whether the determination that an emergency existed was objectively reasonable. *See id.* at 640, 107 S.Ct. 3034; *see also Chalkboard, Inc. v. Brandt,* 902 F.2d 1375 (9th Cir.1989).

The defendants do not dispute that Linden's license constitutes an entitlement amounting to a property interest, nor do they dispute that a deprivation occurred. The plaintiff, for her part, does not dispute that in some situations, the existence of an emergency situation can justify the deprivation of a property interest without notice and an opportunity to be heard. Rather, the plaintiff contends that there is a factual dispute as to whether or not such an emergency situation existed at the time of the suspension, which prevents the Court from determining whether or not the deprivation was justified. This alleged factual dispute is said to arise from contradictory statements from defendant Hartman as to whether or not she believed an emergency existed at the Linden school at the time she made the recommendation to suspend the license. (*See* Pl.'s Ex. B at 137, 158, 183, 190). The Court is asked by the plaintiff to assume that Hartman communicated with her supervisors regarding her unsettled opinion as to the state of emergency

at Linden, and thus that her supervisors knew that she may not have viewed the situation as an emergency. The plaintiff also claims that the investigation completed by Hartman was inadequate and incomplete, and she and the supervisory defendants should have known that the report was an inadequate basis on which to make a license revocation determination.

### Adequacy of Investigation

■ Regardless, of the existence of any factual dispute, plaintiff claims first that the investigation conducted by defendant Hartman was inadequate, and that the supervisory defendants should have known that the report was inadequate and incomplete.

In *Simmons v. Chemung County Dep't of Social Services,* 770 F.Supp. 795 (W.D.N.Y. 1991), the plaintiff owners and operators of a day care center alleged that the defendants unreasonably conducted an investigation into allegations of child abuse and neglect at their day care center.

> In support of these claims, plaintiffs set forth a battery of allegations, most of which state, in substance, that the defendants permitted parents rather than caseworkers to interview their children, subsequently failed to verify the information obtained from these parents, and, in many instances, manipulated the evidence where it was inconclusive so that it would conform to their predetermined views regarding plaintiffs' culpability.

*Id.* at 797. Characterizing plaintiffs' claims as substantive due process claims for baseless or malicious prosecution, the court drew from New York state law on malicious prosecution to conclude that "It is not enough for the plaintiff to show that the state investigators could have done more or could have disclosed more.... Instead, the plaintiffs must demonstrate that the defendants deviated egregiously from accepted practices of investigation or otherwise engaged in conduct that 'shocks the conscience.'" *Id.* at 801. (citations omitted).

In a somewhat different factual setting, the plaintiffs in *Doe,* 712 F.Supp. 277, accused the agency of unconstitutionally depriving them of custody of their son without probable cause to believe he was in immedi-

ate danger. The defendants had a report from a family and child psychotherapist that the child had been sexually molested, and the child had confirmed the sexual contact. Other than contacting the doctor and the Meriden Police, the defendants made no other investigative efforts. The plaintiffs had argued that "defendants should not have inferred a risk of immediate danger" from the facts adduced and "should have investigated further." The court explained that the analysis of whether the defendants were entitled to qualified immunity is "not one of hindsight, but rather is determined by defendants' action 'in the context of the circumstances with which [the official] was confronted.'" *Id.* at 284 (internal citations omitted, alteration in original). Explaining that "further investigation could result in delay during which the described abuse could have continued," the court went on to state that "[w]hile it was not absolutely established that there was ongoing abuse, there was a reasonable basis to believe that there was ongoing abuse which would have had disastrous consequences to any child subjected to such." *Id.* at 285–86. The court further concluded, "[w]hile plaintiffs suggest defendants should have gone further, that is exactly the hindsight which would deter an honest official from action." *Id.* at 286.

In another case alleging deprivation of custody, *Gottlieb v. County of Orange,* 84 F.3d 511 (2d Cir.1996), the plaintiffs alleged that an investigation and removal of a father from the family home violated their constitutional rights because they were denied a hearing before or after the removal, there was an insufficient basis for the separation, and the county's hiring and training of its caseworkers was inadequate. The Second Circuit concluded that inasmuch as government officials may remove a child from his or her home without a hearing if there is a reasonable basis for believing that a threat to the child's health or safety is imminent, a

> rational juror could not fail to conclude that defendants had an objectively reasonable basis for believing that the prompt separation of Andrew from Dawn ... was necessary. The Source had reported on-

going sexual abuse of Dawn; Dawn herself described repeated molestations by Andrew; and Dawn said that Andrew did not like "tattletales" and that she expected to be punished if she spoke of those matters outside of the home.

*Id.* at 520.

In *Cecere v. City of New York,* 967 F.2d 826 (2d Cir.1992), the plaintiff alleged that a supervisor in New York's Office of Special Services for Children violated her civil rights by depriving her of custody of her daughter without due process. The Second Circuit found that the supervisor's belief that an emergency situation existed was objectively reasonable, and that his conduct must be assessed in light of his supervisory role. "Absent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake de novo investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent." 967 F.2d 826 at 829.

The record in the case at hand shows that the allegations of abuse and neglect were originally received by the Meriden Police Department from parents of children at Linden. The police department referred the matter to the DCF, which undertook to investigate the complaints in concert with the Meriden police. In conducting the investigation, Hartman met with the two children on whose behalf the original complaints were filed at the Meriden Police Department, and interviewed them together. One child, who was substantially more forthcoming than the other, reported being spanked on his rear-end, told of being locked in a sleep room alone, said one child's mouth had been taped shut, and told of children being deprived of milk or food if they did not say please. The other child would mostly agree with the first child by nodding his head or giving one word responses. The second child did report that he had been spanked with an open hand by responding "yes" to a direct question, but would only point to his buttocks when asked where he had been spanked. The first child also reported being locked in a shed with no windows.

After interviewing the children, Hartman and the two detectives went to Linden, along with a representative from the DOPH licensing division, where they interviewed four staff members. Although the head teacher denied the allegations, and described "time-outs" as the only method of discipline employed, one of the teachers described numerous acts of abuse and neglect, and voluntarily signed a statement. Among these instances, she related that children were left in the sun without water when requested, a teacher dressed as a witch to scare a child who would not go to sleep at nap time, teachers would regularly slap children in the face and buttocks, and at least one teacher had shaken a child when he misbehaved. This teacher also reported that she heard one of the teachers tell a child who was not fully toilet-trained that if he did not go to the bathroom in the toilet, the turtles decorating his underpants "would bite his butt," thus causing the child to suffer constipation. She also claimed to have witnessed a teacher placing tape over the mouth of a child, and teachers refusing to help a child who had trouble opening his food. This teacher further reported a child was left unattended in the bathroom with the hot water running. When the child scalded his hands, the other teachers did not respond to his screams. On several occasions, children were reported to have sat in soiled underwear for long periods of time. In another alleged incident of negligence, this teacher told the investigators that on one occasion, a child just learning to walk was allowed to climb a four-foot bridge and fell to the ground, suffering two black eyes. Other incidences of neglect or abuse were reported by the teacher to include the other teachers' general practice of stealing food from the children's lunch boxes; slapping of children with open hands, almost every day; and giving a time-out to a child barely passed infancy.

Based on the statements given by the one teacher and the two children, Hartman and Ahearn compiled a report recommending that Linden's license be revoked. They made no recommendation as to whether the revocation should take place summarily or if there was an emergency situation, except to the extent that the case had already been

classified an emergency before it was assigned to Hartman.

According to the protocol for investigation of abuse and neglect in day care settings adopted by the DCF, DOPH, and Department of Human Resources, (Pl.'s Ex. C), the people to be interviewed "at a minimum" include the alleged victim(s), the parent(s) of the alleged victim(s), and the alleged perpetrator(s), and the day care provider/director. It is recommended in the protocol that each child be subjected to a limited number of interviews, and thus, when law enforcement is involved, child interviews should be conducted jointly by the law enforcement and DCF investigators. Other child victims, however, "should not be present during the interview." (Pl.'s Ex. C). The protocol indicates that "it is critical not to ask leading questions" and "not to provide any information regarding the content of other interviews." (Pl.'s Ex. C). Hartman did interview the two children in the presence of one another, contrary to established protocol. She explained that she was not the one who made that decision, but that "[i]t was Detective Brandl's interview and that was how he decided to do it." (Pl.'s Ex. B at 181). The investigation did not include interviews with parents of any children other than the parents of the two children interviewed. (Pl.'s Ex. B at 161).

After receiving Hartman's report, defendant Bell personally met with the teacher, Patricia Thadieo, who confirmed the children's stories of abuse and neglect. (Def.'s Ex. A). Because her allegations formed a key part of the DCF Report, Bell requested, and Ms. Thadieo gave, another sworn statement, in addition to the statement already given to the police and DCF investigators. Bell further reviewed the Meriden Police Report, which included statements the police had obtained, from parents and staff at Linden. In consultation with Harriman and defendant Lewis, they determined based on these materials that an emergency situation existed, supporting a summary suspension of Linden's license. Defendant Lewis, who was Bell's supervisor, considered Bell to be experienced and competent at his job, and herself reviewed the DCF report and police report. (Def.'s Ex. B).

Defendant Addiss also reviewed the DCF report and the Meriden police report. Based on that information, and the recommendations of her staff, Addiss ultimately concluded that probable cause existed to believe that children at the Linden school had been abused or neglected, an emergency situation existed, and accordingly, the circumstances warranted summary suspension of the Linden license.

In making the determination of whether defendant Hartman's investigation was adequate or complete, and whether the supervisory defendants should have known to conduct further investigation, the Court looks at the situation as it would have been viewed by a reasonable official at the time of the decision-making process, not with hindsight educated by subsequent events. At the time of the investigation, Hartman was faced with statements by one child reporting dangerously inappropriate supervision and punishment at Linden school, arguably corroborated by a second child. There is nothing in the record that suggests the information given by the first child was shaped by leading questions or other inappropriate coaching. Troubling, however, is the fact that the children were interviewed together, contrary to the accepted child interview protocol. While Hartman's explanation for the lapse, that she was following the lead of the detective on the case, makes some sense in light of the protocol directive requiring that DCF and the police jointly conduct the child interviews so as to minimize the number of interviews each child must endure, and thus trauma to child interviewees, there remains question as to whether the results of the breach of protocol in simultaneously interviewing the children would provide a basis for an objectively reasonable determination. Given the purpose of the protocol to reduce suggestiveness, the violation casts uncertainty on the usefulness of the second child's corroboration of the first child's statements. Therefore, the Court will, for the purposes of this motion, disregard the second child's arguable corroboration of the first child's story. Disregarding the second child's equivocal responses, how-

ever, the DCF investigation nevertheless had two witnesses—the first child and Ms. Thadieo—independently corroborating each other's statements. The record indicates that it is accepted procedure to use a witness account to corroborate a child's allegations. (See Pl.'s Ex. C at 17). *See also Gottlieb*, 84 F.3d 511 (child victim's description corroborated by unnamed source). The record shows no indication that at the time Thadieo was interviewed by Hartman and the Meriden police, there was any reason to believe that she was an untrustworthy or otherwise incompetent source of information. The investigation protocol explains that "it is important to know as much as possible about [a witness'] background" before interviewing that witness, (Pl.'s Ex. C at 17), but nothing on this record indicates that the Thadieo interview was in any way deficient in this regard.

The fact that Thadieo's credibility subsequently came to be called into question by the hearing officer cannot be the basis for questioning the adequacy of Hartman's investigation, because that would constitute exactly the sort of hindsight review that the doctrine of qualified immunity is supposed to remove. Inasmuch as the record as modified makes no showing of clearly inappropriate or inadequate investigation techniques or any showing that defendant Hartman, or her supervisors, or an objective professional in the same position, would have believed that the report was incomplete or inadequate, the defendants are entitled to qualified immunity on this grounds.

### Report as Basis for Emergency Determination

■ The plaintiff also claims that whether or not the investigation was adequate or complete, a factual dispute exists as to whether or not there was an emergency. This, however, is a misunderstanding of the nature of a genuine factual dispute in the context of summary judgment on qualified immunity. Plaintiff's argument, which depends upon contradictory statements by defendant Hartman as to her opinion of whether or not the situation was an emergency at the time she wrote her report, fails because Hartman's opinion now or then is the inap-

propriate focus. It is the wrong focus both because Hartman was not the decision-maker who concluded that an emergency situation existed at Linden, and because in determining qualified immunity, the Court looks to whether or not an objectively reasonable decision-maker could have found that an emergency existed justifying summary action based upon the facts before the decision-maker, in this case those facts were undisputedly the DCF report, the Thadieo statement, and the Meriden police report. Whatever the exact nature of the events at Linden during the relevant time period, and whatever Hartman's actual opinion as to the nature of those events, the question before the Court is whether or not the defendants acted reasonably, viewed objectively, given the facts presented, not whether there was in fact an emergency situation. This sort of dispute is distinguished from a factual dispute in which the Court cannot determine what information was in front of the decision-making officials at the time of the decision.

Even assuming that defendant Hartman had misgivings about the status of the situation at Linden at the time of her recommendation, and communicated those misgivings to her superiors, the factual dispute asserted by the plaintiff amounts to a dispute as to the conclusions to be drawn from the facts before the decision-making officials. Inasmuch as it was not Hartman's decision to make, her views are relevant only as one piece of information before the supervisory defendants at the time of the decision.

The record shows no reason for the decision-making officials to have suspected the credibility of the information sources contained in the DCF report, the Meriden police report, and the Thadieo statement. Defendant Bell in fact met with Thadieo himself, and obtained a sworn statement from her precisely because her statement constituted the main corroboration of the allegations. Moreover, the defendants had before them complaints from parents who believed that something wrong was happening to their children at Linden detailing injuries to their children which they attributed to inadequate care at Linden, and statements from at least

one child as to inappropriate or negligent conduct towards himself and other children.

The conclusions in the reports—that children were regularly being slapped, refused water on hot days, unsupervised in dangerous situations, etc.—are sufficiently serious such that a reasonable official who had valid basis to accept the credibility of the allegations would have little difficulty in concluding that children were in danger, and an emergency situation existed.

The determination by the supervisory officials of the status of the situation at Linden is just the sort of discretionary decision-making process that qualified immunity is meant to protect. *See van Emrik v. Chemung County Dept. of Social Services,* 911 F.2d 863, 866 (2d Cir.1990) ("It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it."). In the absence of a record indicating that there was reason for the defendants to believe that the report was in any way inadequate or that the investigation was misconducted, the supervisory defendants were entitled to rely on the facts as presented in the report to make their decision regarding the Linden license. The facts as presented in the report, furthermore, presented a scenario troubling enough such that no reasonable jury could find that the officials acted objectively unreasonably under the circumstances.

### Conclusion

For the foregoing reasons, defendants' motions for summary judgement [docs. # 29, # 34] are GRANTED, on the grounds of qualified immunity.

IT IS SO ORDERED.