Akil AL–JUNDI, et al.,
Plaintiffs–Appellees,

v.

Vincent MANCUSI, Karl Pfeil, Russell G. Oswald, Defendants–Appellants,

The Estate of Nelson A. Rockefeller, et al., Defendants.

Nos. 686–688, Dockets 90–2287, 90–2289 and 90–2291.

United States Court of Appeals, Second Circuit.

Argued Jan. 10, 1991.

Decided Feb. 27, 1991.

---

**3.** ·Indeed, appellant conceded the elements of knowing possession in his closing statement to the jury.

John H. Stenger, Buffalo, N.Y. (Kathy R. Lamb, Jaeckle, Fleischmann & Mugel, Buffalo, N.Y., on the brief), for defendant-appellant Oswald.

Richard E. Moot, Buffalo, N.Y. (Darryl J. Colosi and Judith M. Bell, Moot & Sprague, Buffalo, N.Y., on the brief), for defendant-appellant Mancusi.

Irving C. Maghran, Jr., Buffalo, N.Y. (Mahgran, McCarthy & Flynn, Buffalo, N.Y., on the brief), for defendant-appellant Pfeil.

Elizabeth M. Fink, Brooklyn, N.Y. (Dennis Cunningham, Brooklyn, N.Y. and Michael E. Deutsch, Chicago, Ill., on the brief), for plaintiffs-appellees.

Before KAUFMAN, NEWMAN and McLAUGHLIN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

The issue on this appeal is whether three senior corrections officials of the State of New York are entitled to avoid trial, on grounds of qualified immunity, in a suit brought by victims of the violence that occurred at the Attica Correctional Facility in 1971. *See Inmates of Attica Correctional Facility v. Rockefeller*, 453 F.2d 12, 22–24 (2d Cir.1971) (granting preliminary injunction restraining state officials from engaging in torture, beatings, and other physical abuse). The issue arises on an appeal by Russell G. Oswald, former Corrections Commissioner, Vincent Mancusi, former Superintendent of Attica, and Karl Pfeil, former Assistant Deputy Superintendent of Attica, from the June 26, 1990, order of the District Court for the Western District of New York (John T. Elfvin, Judge), 1990 WL 97729 denying their mo-

tion seeking summary judgment on grounds of qualified immunity. We affirm in part, reverse in part, and remand for trial.

### Background

The background facts underlying the tragic episode with which the name "Attica" is likely to be forever identified are by now familiar. We have set them forth in our early decision upholding preliminary injunction, *Inmates of Attica Correctional Facility v. Rockefeller, supra,* and in our more recent decision affirming dismissal of the lawsuit against the estate of former Governor Rockefeller, *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060 (2d Cir.1989). It suffices to recall that on September 9, 1971, more than 1,200 inmates at Attica rioted and seized control of portions of the prison, and some of them seized corrections officers as hostages. Some of the seized portions were retaken the same day, but prisoners continued to occupy an area known as D–Yard. On September 13, after negotiations failed, Oswald received permission from the Governor to order the State Police to retake the prison by force. The retaking, organized by the State Police, resulted in the deaths of ten hostages and twenty-nine prisoners. Afterwards, several prisoners were the victims of brutal reprisals.

The amended complaint, filed in 1975, alleged denials of constitutional rights arising from three phases of the operation: the plan to retake the prison and the implementation of that plan, the brutality inflicted upon the inmates thereafter as reprisals, and the prosecution of inmates for crimes committed during the riot. By the time the qualified immunity defense of the three appellants was submitted for the ruling that is challenged on this appeal, the first portion of the amended complaint had been dismissed against Mancusi and Pfiel, and the third portion had been dismissed against Pfiel. In the immunity ruling, Judge Elfvin dismissed the third portion

against Oswald and Mancusi. Thus, what remains for trial are the first portion (the planning) as against Oswald and the second portion (the reprisals) as against all three appellants.[1] Whether qualified immunity was established as a matter of law as to these aspects of the amended complaint is the subject of this appeal.

### Discussion

Qualified immunity is available on motion for summary judgment if it appears, from undisputed facts, that an officer's conduct did not violate constitutional rights that were clearly established at the time of his actions, or if it was objectively reasonable for him to believe that his actions did not violate such rights. *See Anderson v. Creighton,* 483 U.S. 635, 638–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982); *Robison v. Via,* 821 F.2d 913, 920–21 (2d Cir.1987). Prisoners' Eighth Amendment right to be free from brutal treatment had been recognized prior to the Attica riot, *see Wright v. McMann,* 387 F.2d 519, 525–26 (2d Cir.1967). The Supreme Court has more recently cautioned that the "deliberate indifference" standard applicable to prisoners' medical claims does not apply to "making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). In that context, the test is " 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Id.* at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). This more exacting standard is imposed not to foster brutality that results from deliberate indifference but to lessen the risk of harm to both

---

**1.** In addition, the first and second portions of the amended complaint are pending for trial as against the administrator of the estate of John Monahan, formerly a State Police major who planned and led the retaking of the prison. All other defendants have been dismissed for a variety of reasons, many for lack of service.

prisoners and prison personnel that might result if those responsible for restoring order in the context of prison riots became hesitant to act promptly and effectively in apprehension of liability too easily imposed.

Since the contours of the Eighth Amendment's protection in the context of a prison riot were not authoritatively delineated until the Supreme Court's 1986 decision in *Albers*, it is arguable that qualified immunity insulates appellants from liability for any consequences of the decision to retake the prison and of the methods used in the course of the retaking. But we do not understand appellants' argument to press so far, and we would not find such an argument persuasive. *Albers* did not recognize "a constitutional right that had not yet been declared," *see Procunier v. Navarette*, 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978). Rather, it narrowed the scope of a right previously recognized. Thus, appellants cannot and do not contend that they could not reasonably be expected to know that there were constitutional limits on a prison administrator's response to a prison riot. However, they can and do contend that the standard announced in *Albers* governs this case, and they further assert that they are entitled to immunity because it was objectively reasonable for them to believe that their actions did not violate the constitutional rights of the plaintiffs, as refined in the *Albers* decision.

In assessing this claim, we cannot apply the heightened *Albers* standard indiscriminately to all aspects of the conduct alleged to have been taken or condoned by the appellants during the events at Attica. *Albers* insisted that the "deliberate indifference" standard applicable to many Eighth Amendment claims of prisoners must give way in the prison riot context to the "wanton infliction of pain" standard when evaluating a claim concerning the use of force in retaking a prison. As the Court noted, from such considerations as " 'the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted,' ... inferences may be drawn as to whether the use of force could plausibly

have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." 475 U.S. at 321, 106 S.Ct. at 1085 (quoting District Court, 546 F.Supp. 726, 733 (D.Ore.1982)). The use of force to retake the prison is the essence of the first category of the prisoners' amended complaint, and there can be no doubt that the *Albers* standard applies to all aspects of the decision to use force in accomplishing the task and in the implementation of that decision. *Albers* does not mean that a prison riot affords prison administrators limitless authority to employ any means, no matter how brutal, to restore order. It does mean that the decision to use force and the extent of force employed are to be assessed, for purposes of asserted Eighth Amendment violations, under the heightened standard of whether injury and pain were wantonly inflicted "for the very purpose of causing harm." However, this heightened standard, framed to assure prompt and effective action to use necessary force to restore order, does not apply to actions of prison officials unrelated to the decisions about whether and how to use force for that purpose. Thus, in this case, we will apply *Albers* faithfully to those aspects of appellants' conduct implicated in the use of force to retake the Attica prison, but we will not go beyond traditional Eighth Amendment standards in assessing, for purposes of qualified immunity, those aspects of their alleged conduct that are fairly separable from decisions regarding the use of force.

■ Applying this approach, we turn to the first category of the amended complaint, the allegations against Oswald for his alleged role in the plan to retake the prison. Oswald contends, in an argument focusing more on liability than on the defense of immunity, that he bears no responsibility for the adoption and implementation of the retaking plan because the decision to order a retaking was made by Governor Rockefeller and the formulation and implementation of the specific plan for the retaking was the responsibility of Major Mona-

han of the State Police. If the liability aspects of the claim against Oswald were before us on this limited appeal, which concerns only the immunity defense, we would doubt that Oswald would be insulated from responsibility for lack of personal involvement. There appears to be sufficient evidence to support findings that he was the senior corrections official on the scene, that he was aware of the retaking plan, and that he had discussed with Monahan at least some of the specific details of the plan.

However, with the exception of the planning for medical care, the deficiencies in the recapture plan alleged by the plaintiffs do not overcome the immunity defense, assessed under the standards of *Albers*. For example, Oswald is faulted because the plan did not include an ultimatum to the prisoners prior to the attack, because he authorized an assault by a large force of armed men even though the prisoners were first subjected to a barrage of CS tear gas, and because he permitted correctional officers to participate as "backup" to the state police despite the extreme hostility the officers bore toward the prisoners as a result of the takeover and the threats to the hostages. Each of these aspects of the plan, even if attributable to Oswald, might be found to constitute negligence, and some might even be found to show deliberate indifference to the likelihood that harm would result. But, after *Albers*, that is not sufficient. To establish liability, there must be evidence to show that these aspects of the assault plan were included wantonly for the purpose of inflicting pain, and to overcome the immunity defense, there must be evidence permitting a finding that it was not objectively reasonable for Oswald to believe that the plan did not involve the wanton infliction of pain. The decision not to issue an ultimatum is precisely the sort of tactical matter on which "neither judge nor jury [may] freely substitute their judgment for that of officials who have made a considered choice." *Albers*, 475 U.S. at 322, 106 S.Ct. at 1085. The decision required weighing the enhanced likelihood of surrender against the enhanced likelihood of precipitating action

against the hostages and of enabling the prisoners to improve their defense against the assault. Similarly, whether to use 150 men, as Monahan determined to be necessary, or to use fewer, as plaintiffs believe would have been sufficient, is a choice carrying no inference as to the wanton infliction of pain.

Closer to the line is the decision not to preclude the use of corrections officers entirely from the assault, but here again, tactical choices needed to be made; the use of corrections officers, even as backup, posed a risk of aggressive conduct, but the failure to use them posed a risk of prolonging the battle between state police and armed prisoners, with dire consequences for all concerned. In terms of the immunity defense, we conclude that no reasonable jury could find that Oswald did not have objectively reasonable grounds for believing that the decision to retake the prison and the plan for doing so did not involve the wanton infliction of pain. The defense of qualified immunity as to these portions of the complaint must be upheld.

 The alleged deficiency in planning for the medical needs of the prisoners stands on a different footing. Once it was decided to retake the prison by force, the duty to make adequate provision for medical needs arose to at least the same extent as it does with respect to the normal operation of a prison. The *Albers* standard applies to the decision to use force and the means selected for implementing that decision, but not to the normal obligations of prison officials to meet the minimal needs of those in their custody. Thus, Oswald can be found liable if evidence shows that he was deliberately indifferent to the medical needs that could reasonably be expected to arise in the aftermath of the assault. And Oswald can obtain immunity on a motion for summary judgment only if undisputed evidence shows that it was objectively reasonable for him to believe that his conduct, with respect to planning for medical needs, satisfied at least the constitutional standards of *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (deliberate indifference to serious

medical needs is cruel and unusual punishment). *See Martinez v. Mancusi,* 443 F.2d 921 (2d Cir.1970), *cert. denied,* 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971) (anticipating standards of *Estelle v. Gamble*). We agree with Judge Elfvin that the evidence of Oswald's lack of attention to planning for medical needs creates jury issues and precludes sustaining, as a matter of law, a qualified immunity defense to this one aspect of the first portion of plaintiffs' allegations.

We turn next to the second portion of the amended complaint, the allegations of condonation of brutal reprisals against the prisoners after the prison was retaken. There is no basis for applying the heightened *Albers* standard to these allegations. The latitude accorded prison officials in deciding when and how to use force to retake a prison from rioting inmates has no application to the summary infliction of brutal punishment once the riot is quelled. As to such conduct, appellants cannot establish an immunity defense on motion for summary judgment if any evidence shows that it was not objectively reasonable for them to believe that they were adhering to the constitutional standards that apply to prison officials in the administration of prison discipline.

The prisoners make no claims that any of the appellants personally participated in the reprisals or directly ordered them to occur. With respect to Oswald, the claim is that he received reports of brutality and must have either observed brutality or deliberately avoided seeing it when he toured the prison about one hour after the assault ended, at a time when hundreds of inmates were allegedly being beaten and brutalized. These allegations find sufficient support in the evidence to withstand a motion for summary judgment on the issue of qualified immunity. With respect to Mancusi and Pfeil, one prisoner has submitted an affidavit that he saw both appellants observing brutal beatings being administered to himself and other prisoners, and the affidavit of another prisoner corroborates this account. Though appellants urge that these affidavits, filed on the eve of trial, are unworthy of belief, that argument is for the jury. Indeed, there is considerable irony in the argument of prison officials, who have in their custody scores of prisoners convicted on the testimony of disreputable criminals, that the testimony of criminals is incredible as a matter of law when it accuses them of unconstitutional conduct.

Appellants' remaining contentions have nothing to do with the defense of qualified immunity, which is the subject of this interlocutory appeal, *see Neu v. Corcoran,* 869 F.2d 662, 664–65 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989), and we decline to consider them. However, we do express our concern that this case should be brought to trial at the earliest possible moment. At oral argument counsel for the plaintiffs assured us that they were ready for trial immediately following the disposition of this appeal. We urge the District Court to hold them to that commitment and to tolerate no delays by the defendants.

The order of the District Court is affirmed in part and reversed in part, and the case is remanded for a prompt trial. The mandate shall issue forthwith.