**Mary Jane PACE, et al., Plaintiffs**

v.

**Alinette MONTALVO, et al., Defendants**

**No. 3:99–CV–01635(EBB).**

United States District Court, D. Connecticut.

July 24, 2001.

John R. Williams, Williams & Pattis, New Haven, CT, for Plaintiffs.

Susan T. Pearlman, Attorney General's Office, John Essex Tucker, Attorney General's Office, Hartford, CT, Charles H. Benson, Attorney General's Office, Hartford, CT, for Defendants.

### RULING ON MOTION FOR SUMMARY JUDGMENT

ELLEN B. BURNS, Senior District Judge.

### INTRODUCTION

This cause of action is a one-count Complaint based on 42 U.S.C. Section 1983. Plaintiffs allege that Defendants, acting jointly and severally, disrupted their family life and "infringed the right of each plaintiff to family integrity and privacy." Specifically, Plaintiffs contend that the following actions infringed on their constitutional rights, for which they seek redress via Section 1983:(1) the taking of custody

of the Pace children on the evening of July 16, 1997, pursuant to a 96–hour hold during a child abuse/neglect investigation; (2) the placing of the children in a foster home from the evening of July 16, 1997, to July 18, 1997, which home the Plaintiffs allege could not meet the needs of the Pace children, as hearing-impaired individuals; (3) the filing of neglect petitions in the Juvenile Session of the Superior Court with regard to the Pace children, notwithstanding the fact that the Department of Children and Families (the "Agency" or "DCF") did not seek custody of the children and ultimately withdrew the petitions without prejudice to their refiling, due to the lack of cooperation by the Paces. These actions are deemed to be violative of the Plaintiffs' substantive and procedural due process rights, the right to be free from unjustified and unreasonable invasion of their family privacy, and the right to be free from the tort of malicious prosecution.

Defendants have moved for summary judgment on the defense of, *inter alios,* qualified immunity.

### STATEMENT OF FACTS

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, this Motion. The facts are distilled from the Complaint, the exhibits to the summary judgment moving papers and the parties' uncontroverted Local Rule 9 Statements.

On July 16, 1997, at approximately 7:58 a.m., Officer Thomas Hoffman ("Hoffman"), a police officer with the Town of Stratford, was dispatched to the residence of Alan Sr. ("Pace") and Mary Jane Pace ("MJP") to cover a response by the Stratford EMS, who had responded to that location on a report of a female having difficulty breathing.

When Hoffman arrived on the scene, EMS personnel were placing MJP into an ambulance. She was having difficulty breathing and appeared to be dazed and somewhat incoherent. Hoffman asked MJP what had happened to her, and she told him that she had gotten up at 4:00 a.m. that morning to bake a cake for her son's birthday, and that her husband had gotten up and pushed her down. Hoffman asked MJP if she was injured or had any bruises from being pushed by her husband. MJP replied that she could not remember, but that she did not think that she was injured. MJP was then transported to Bridgeport Hospital to receive medical treatment for her difficulty in breathing.

Hoffman next went to the hospital for additional information. When he arrived at the hospital, he was advised that MJP had told the EMS personnel, while en route to the hospital, that her husband beats her and her two children and that she did not want to go home.

Hoffman was joined at the hospital by Sergeant Joseph LoSchiavo ("LoSchiavo"). The officers interviewed MJP in the emergency room. Dolly Maldonado ("Maldonado"), a hospital social worker, sat in on the interview for part of the time.

MJP told Hoffman and LoSciavo that she had gone to the emergency room the day before for medical difficulties.[1] When she arrived home, her husband began yelling at her and pushed her to the ground, telling her there were no reasons that she should be sick. She did not call the police because she was very afraid of her husband. She further told the officers that

---

1. Although Plaintiffs admitted and denied, without specification, the recounting set forth in this and the following three paragraphs, it was these statements which were reported to DCF which then began its investigation.

she was afraid that her husband would kill her if she did. She also stated that her husband was a former Bridgeport police officer, with many friends left on the force. She believed that no other officer would believe her and do anything to assist her.

When MJP got up to make her son's birthday cake, and as her husband was pushing her to the ground, her dog came to protect her, at which time Pace kicked and beat the dog. Again, she reported that had she called the police, Pace would have killed her.

During this meeting, MJP reported that her two hearing-impaired sons were also afraid of their father. She reported that on several occasions when her children had been left with Pace, she would come home to find them bleeding, and her husband would tell her that the children had hurt themselves. MJP also advised the officers that, in the past, her husband had been investigated by DCF for child abuse. During that prior investigation, she had lied to the DCF case worker, because she was afraid that her husband would kill her if she told the truth.

In Hoffman's affidavit regarding this meeting, he averred that, while MJP appeared to be distraught and extremely fearful of her husband, both he and LoSchiavo believed her and found her statements to be credible.

Based on this interview, both Hoffman and Maldonado reported the alleged child abuse and MJP's statements to the DCF hotline, as they were responsible for doing. On that evening, Judith Kallen ("Kallen"), then Program Supervisor for the DCF Bridgeport office, received a telephone call from the DCF hotline worker, during which she was apprised of the situation and of the concern for the two children, Alan, Jr. and Joseph. Kallen also learned that, among other things, the children's mother had made allegations that her husband had committed acts of domestic abuse against her and the two boys. On that same evening, Kallen spoke with one Officer Brian Zolla ("Zolla") of the Stratford Police Department and she obtained further distressing information regarding the Pace family. Zolla told her that MJP's father (the children's grandfather) had threatened to kill Pace and that Pace had an "arsenal" of guns at his home, some of which were unsecured. The whereabouts of MJP's father were unknown. Although arrangements had been made for the children to stay with relatives for the evening, Pace had nevertheless picked up the children and taken them home, the location of the unsecured guns. In toto, the police were deeply concerned about the safety of the children.

Kallen averred that, due to her own serious concerns for the safety of the Pace children, she contacted the on-call social worker supervisor, Defendant Marie Lopez ("Lopez"), and directed her to go to the Pace home to check on the situation and to then call her.

Prior to going to the Pace home, Lopez went to the Stratford Police Department and spoke with Zolla, who told her what he had told Kallen. When he found out that Lopez was going to the Pace home, he determined that officers should accompany her, several of whom did. Upon arrival at the Pace home, the officers advised her to stay in the car until they told her that it was safe to come inside. Once they did so, Lopez noted that the lights in the house were dimmed, and that Pace appeared to be nervous and agitated, pacing back and forth. He denied the allegations of domestic abuse and unsuccessfully attempted to contact his lawyer.

Lopez went out to the front porch and called Kallen, reporting her findings. Due to their varying positions within DCF, it was Kallen alone who could invoke the 96–hour hold, removing the children from the

troubled home for that period of time. Kallen determined to invoke the 96–hour hold and advised Lopez to remove the children from the household.

At Kallen's directive, Lopez took the Pace children back to the police station where she attempted to find emergency foster care for them. Lopez contacted a family known to her to be responsible and to have experience with dealing with children with specialized needs, including speech difficulties. The couple agreed and Lopez took the Pace children to their home late on the evening of July 16. Defendants Barr, Rogers, and Montalvo had no involvement in the placement of the Pace children in foster care.

On the morning of the 17th, Lopez called the foster parents to determine how the children were doing, which inquiry was answered positively.

On that same date, pursuant to DCF policies and procedures, the allegations of abuse and neglect were turned over for investigation by an investigative social worker, John Rogers ("Rogers"). After an initial meeting with Defendant Rogers to determine the parameters of his investigation, Lopez had no more involvement in the case.

Over the next eleven days, Rogers conducted a thorough and exhaustive investigation of the allegations involving the Pace household. He met with the children, and Alan, Jr. verified the fact that their father had hit them with belts. Rogers interviewed Maldonado, who stated that MJP had reported that she was physically assaulted by her husband. On that same day, he interviewed MJP who stated to him that, her husband had assaulted her on July 16 and that he was abusive towards the children, calling them "f___ing

deaf mutes" and had always expressed embarrassment at having two special needs children. She further told Rogers that Pace regularly used physical discipline on the children and if she intervened, he would beat her. She also told Rogers of finding questionable bruises on the boys after having left them alone with their father. Finally, MJP advised Rogers that her family had had involvement with DCF in 1996, at which time she denied her claims of domestic abuse in front of her husband, because she "feared for her safety."[2]

As set forth in his affidavit, Rogers averred that, based on the numerous occasions he has conducted these sorts of interviews in the course of his employment, he found that MJP was lucid, consistent, and spontaneous with her responses. Rogers reported that he found her statements to be credible.

During the course of the next six days, Rogers conducted numerous interviews and consistently found corroboration for MJP's allegations. The medical reports of her hospitalization found no psychosis and that her stay was "characterized with her being calm and cooperative with treatment." As she was afraid of meeting her husband, the discharge plan was that she and her children would live with her parents.

Rogers also reviewed the DCF hotline report summarizing the reports from Maldonado and Hoffman, as well as all other relevant documents.

On July 18, Rogers learned that MJP had been discharged from the hospital. He met with her, at which time she signed a one-page service agreement with DCF. The duration of the agreement was one

---

**2.** Although Plaintiffs disagree with these claims, MJP cannot recall the events of July 16, Dep. at 31, but denies saying any of the things attributed to her in the hospital records.

month. In signing the document, MJP agreed to, among other things, accept services from DCF in order to achieve the goal of keeping her "children safe from harm and neglect." She also agreed to the following term of the agreement: "to pursue a restraining order against your husband due to your expressed concerns for abuse from him." At this point in his investigation, it was clear to Rogers that MJP and the children needed services from DCF. By having MJP voluntarily agree to accept services and cooperate with the Agency, it was his hope that the initiation of court proceedings could be avoided. The children were returned to MJP on July 18 and they went to live with her parents. On July 23, MJP advised Rogers that she had obtained a restraining order against her husband.

During a July 29 visit to MJP at her parents' home,[3] Rogers administered a domestic abuse questionnaire to her. In the course of answering this questionnaire, MJP disclosed that she felt "trapped and hopeless." Among other things, she indicated that her husband had: called her degrading names, broken furniture, pulled the telephone out of the wall, physically abused her, hurt her pet(s), called one or both of their children by degrading names, threatened to take the children from her care, and hit one or both of the children with belts, straps, or other objects. Again, based on his years of investigative experience of this type, Rogers believed her answers to be truthful.

On July 29, Rogers substantiated abuse and neglect and recommended that services be provided to the family. At that time, the case was turned over to the treatment planning unit and his involvement in the case ceased.

Treatment social worker Defendant Alinette Montalvo ("Montalvo") was assigned to the Pace case. Almost immediately, MJP failed to cooperate with Montalvo's treatment plan. MJP began to refuse services, which, upon review of an old file involving the same family and same allegations, determined that this was a pattern of MJP. At that time, in 1996, the Agency had offered MJP and Pace support services and parenting classes, which Montalvo learned they had refused.

Prior to Montalvo being assigned to the case, MJP was referred to Guenster Rehabilitation Center for a substance abuse evaluation. Montalvo reviewed a communication from Guenster indicating that MJP had refused to complete the evaluation, on the advice of her attorney.

On September 18, MJP contacted Montalvo and advised her that she and her children had moved back home. Although she indicated that Pace had moved out, she refused to give Montalvo any more information.

On September 29, MJP contacted Montalvo by telephone and told her that all contacts with DCF had to be made through her attorney. That same date, Montalvo spoke with the Pace's attorney who advised Montalvo that DCF had no reason to visit the Pace family and that he had advised the Pace family not to let anyone from DCF into their home.

Montalvo informed her supervisors, Lopez and Defendant Adrienne Barr ("Barr"), of this turn of events concerning the Pace family. Barr determined, in consultation with Montalvo and Lopez, that neglect petitions should be filed. In reaching this decision, Barr relied on the information provided to her by Lopez and Montalvo. Further, given that domestic violence and abuse had been substantiated through Roger's exhaustive investigation, and the current refusal of the Pace's to

---

**3.** MJP's parents also verified that MJP had told them of the domestic abuse.

cooperate with DCF, in Barr's view, it was appropriate for DCF to file neglect petitions to seek court involvement with this family. Given the Pace's continued unwillingness to participate in any help being offered to them, the petitions were dismissed without prejudice to refiling them.

At her deposition, MJP had no recollection of telling anyone about the domestic violence she had reported existed in her home. She alleges in her Local Rule 9(c) statement that Defendant Rogers forced her to sign a document making false allegations against Pace and directing her to seek a restraining order against him. MJP now alleges that she told "the Defendants" at the time that these allegations were false and that she did not wish to make them. She further alleges that "the Defendants" told MJP that she would not get her children back unless she signed the document.

## LEGAL ANALYSIS

### I. The Standard of Review

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

If the non-moving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case

necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. 2548. *Accord, Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d. Cir.1995) (movant's burden satisfied by showing if it can point to an absence of evidence to support an essential element of non-moving party's claim). The opposing party cannot defeat the motion by allegations in his or her pleadings or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the non-moving party...." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). If the non-moving party submits evidence which is "merely colorable", or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Rather, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial'". *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *quoting* Fed.R.Civ.P. 56(e). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality,

the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original). *Accord Gottlieb*, 84 F.3d at 518.

Because the defense of qualified immunity is designed to relieve government officials of the burdens of litigation, as well as the threat of damages, summary judgment is encouraged as a device for disposing of claims barred by qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

## II. *The Standard As Applied*

The defense of qualified or "good faith" immunity shields government officials from civil liability if the official's conduct did not violate constitutional rights that were clearly established at the pertinent time or if was objectively reasonable for the official to believe that the conduct did not violate such rights. *Al–Jundi v. Mancusi*, 926 F.2d 235, 237 (2d Cir.)( *citing Harlow v. Fitzgerald*, 457 U.S. 800, 818–·819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)), *cert, den'd, Mancusi v. Al–Jundi*, 502 U.S. 861, 112 S.Ct. 182, 116 L.Ed.2d 143 (1991). *See also Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987) (police officer and state attorney shielded by qualified immunity where they removed children from mother's custody after schoolmates reported sexual and physical abuse); *Doe v. Conn. Dept. Of Child and Youth Services*, 911 F.2d 868, 870 (2d Cir.1990) (granting qualified immunity to state social workers who, *inter alia*, placed 96–hour hold on parental custody and placed child in foster home).

The doctrine protects public officials from the risk of potentially ruinous monetary liability which would deter qualified people from public service and safeguards the public interest in having government employees act with "independence and without fear of consequences". *Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir.1988), *quoting Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (citations omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

There are a number of ways in which a defendant official may establish a defense of qualified immunity under Section 1983. First, purely as a matter of law the defense should be sustained if the court finds that it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution. Second, even if the interest asserted by the plaintiff was clearly a type generally protected by federal law, the defendant is entitled to immunity as a matter of law if it was not clear at the time of the acts at issue that an exception did not permit these acts. Third, even if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights. *Robison*, 821 F.2d at 920–921. "This Circuit has adopted a standard governing case workers, which reflects the recognized need for unusual deference in the abuse investigation context. An investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse." *Wilkinson ex rel Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir.1999) (citation omitted).

■ In the present case, Plaintiffs allege that their due process rights were

violated when the Defendants placed a 96–hour hold on the custody of their children, and removed them to a foster home for that period of time, which foster care home could not give proper care to their hearing-impaired children.[4]

 To be sure, when the Pace children were taken into custody, it was clearly established that a parent's interest in the custody of his or her children was a constitutionally protected "liberty" of which he or she could not be deprived without due process which would ordinarily require a predeprivation hearing. *See Stanley v. Illinois*, 405 U.S. 645, 649–48, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Robison*, 821 F.2d at 921. It is also reasonable to believe that as social workers dealing with family units on a daily basis, this constitutional interest was known—or should have been known—by Defendants herein. Where, however, there is an objectively reasonable basis for believing that parental custody constitutes a threat to the child's health or safety, government officials may remove a child from his or her parents' custody, "without parental consent or a *prior* court order." *Duchesne v. Sugarman*, 566 F.2d 817, 826 (2d Cir.1977)(emphasis in original). "When a child's safety is threatened, that is justification enough for action first and hearing afterward." *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983)(due process not violated by taking of custody without a prior hearing when witnesses had told officials that parent beat children and kept loaded guns in house). Thus, under the second and third prongs of the *Robison* analysis, the 96–hour hold on custody and removal of the Pace children was objectively reasonable as Defendant Lopez personally observed and recorded the situation and reviewed the police and EMS personnel statements. She, as well as the other three Defendants, is to be granted qualified immunity as to that act.[5]

As to the claim of a denial of procedural due process, the Defendants are also qualifiedly immune. On the very next morning following the implementation of the 96–hour hold, Defendant John Rogers began his investigation into the matter. His investigation, which lasted for over ten days, was thorough and concise and gave the Plaintiffs more than ample time to put forth their evidence and tell their "side of the story." The Pace children were returned to their mother as soon as she was released from the hospital, when she took them to live, along with her, at her parents house.[6] Rogers' investigation included contacting, either by telephone or in personnel interviews, Mrs. Pace and eight

---

**4.** The Court finds that no due process rights were violated by this placement, which was with licensed foster parents experienced in caring for special needs children, including children with language difficulties. *Accord Greco et al. v. Bonola et al.*, 3:99–CV–1263 (SRU)(June 22, 2000)(no due process right to American Sign Language interpreter) (citations omitted).

**5.** The Complaint does not set forth with clarity which Defendant is liable for what act. Accordingly, the Court, in an exercise of caution, will grant immunity to all Defendants as to those acts as to which the Court finds the doctrine is applicable and warranted. Inasmuch as the Complaint does, however, refer to the Defendants as acting "jointly and severally", if the qualified immunity defense is good to one Defendant, it is good as to them all. Additionally, a government official's conduct may be actionable under Section 1983 as a substantive due process violation only if it "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). This Court holds that the only thing which would have shocked its conscience was if the Defendants, knowing what they knew in such a violent, volatile situation, had *not* taken the action they did.

**6.** The children were returned to their mother prior to the end of the 96–hour hold.

other individuals who had substantiated the abuse and neglect. He also verified this through two reports to the DCF hotline and by reading all medical reports written during Mrs. Pace's hospitalization. Rogers, with what he believed to be credible information, reported to his supervisors that he had substantiated child abuse and neglect and recommended that the Pace family be provided with DCF services.[7] Rogers' interaction with the family concluded after his exhaustive investigation. Accordingly, Plaintiffs cannot complain now that their rights to procedural due process were not honored. Defendants are granted qualified immunity as to the claim of violation of the procedural due process clause.

In any event, to the extent that the Plaintiffs claim that the investigation which led to the filing of the neglect petitions was incomplete or inaccurate, that would, at most, amount to a claim of simple negligence. Such a claim is insufficient to state a cause of action under Section 1983. *See Davidson v. Cannon*, 474 U.S. 344, 346–47, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). *See also DeRosa v. Bell*, 24 F.Supp.2d 252 (D.Conn.1998)(social worker supervisors protected by qualified immunity where plaintiffs claimed that child abuse investigation was deficient).

Finally, Plaintiffs seem to allege a constitutional right to be free from the filing of the neglect petitions, under the guise of "malicious prosecution." In contradistinction, however, the Agency has a mandate to take whatever actions may be necessary to protect the safety and welfare of children, including the filing of court petitions. *See* Conn. Gen.Stat. § 17a–101. Here, the neglect petitions, as clarified by the massive summary of facts in support of the petitions, sought only protective supervision, which is the least invasive of the alternatives open to the Agency. In such a situation, the children remain in the custody of the parents but the court retains continuing jurisdiction and involvement in the case. *See* Conn. Prac. Bk. § 26–1(*o*)(2).

Additionally, in a civil setting, where the defendant is subject only to civil, not criminal, liability, any abuse asserted by Plaintiffs would have to have been abuse of process, rather than malicious prosecution. *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir.1992). While Section 1983 liability may be predicted on a claim for malicious prosecution in the criminal setting, *e.g. White v. Frank*, 855 F.2d 956, 961 n. 5 (2d Cir.1988), it may not be predicated on a claim for malicious abuse of process. *Spear*, 954 F.2d at 68. Accordingly, summary judgment must be granted on the cause of action sounding in "malicious prosecution".

## CONCLUSION

Plaintiffs have failed to make a sufficient showing on essential elements of their case with respect to which they have the burden of proof at trial. Accordingly, then, summary judgment is appropriate. *Celo-*

---

**7.** Barr and Lopez were supervisory employees. As such, they were entitled to rely not only upon Rogers' thorough investigation, but the representations of the social worker assigned to the case, Alinette Montalvo. "Absent some indication to a superior that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake de novo investigations or cross-examine subordinates reasonably believed to be competent as to whether their investigations were negligent." *Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir.1992) (supervisor believed caseworker was capable and conscientious and in the absence of an indication of inadequacy of investigation, supervisor entitled to qualified immunity.). As averred to in affidavits submitted to this Court these three supervisors believed in the accuracy and thoroughness of Rogers' investigation. Hence, all three are entitled to qualified immunity for this reason, also.

*tex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. 2548. A rational juror could not fail to conclude that the Defendants had an objectively reasonable basis for the actions taken by them. *Accord Gottlieb v. County of Orange,* 84 F.3d 511, 520 (2d Cir.1996).

For these reasons, and all those set forth herein, the failure of Plaintiffs to overcome the defense of qualified immunity is fatal to their claims and mandates the grant of summary judgment in Defendants' favor. Accordingly, the Motion for Summary Judgment [Doc. No. 19] is hereby GRANTED. The Clerk is directed to close this case.

SO ORDERED.