**ADOPTION SERVICES OF CONNECTICUT, INC.,**
Plaintiff

v.

**Kristine D. RAGAGLIA et al., Defendants**

**No. 3:98 CV 2498(CFD).**

United States District Court, D. Connecticut.

Dec. 17, 2001.

John R. Williams, Williams & Pattis, New Haven, CT, for Plaintiff.

Gregory T. D'Auria, John Essex Tucker, Attorney General's Office, Hartford, CT, Stephen D. Vitelli, Attorney General's Office, Health & Human Services, Hartford, CT, Patricia E. Naktenis, Attorney General's Office, Child Protection, Hartford, CT, for Defendants.

### RULING ON MOTION FOR SUMMARY JUDGMENT

DRONEY, District Judge.

The plaintiff, Adoption Services of Connecticut, Inc., ("Adoption Services") brings this action against the defendants, Kristine D. Ragaglia, Michael J. Schultz, Gary Minetti, and Lawrence J. Pysh, pursuant to 42 U.S.C. § 1983. Adoption Services alleges that the defendants, officials of the Connecticut Department of Children and Families ("DCF"), suspended its license to operate a child adoption agency without a prior hearing in violation of its procedural and substantive due process rights under the Fourteenth Amendment to the United States Constitution and in violation of Connecticut's Administrative Procedure Act,

Conn. Gen.Stat. § 4–182.[1] Adoption Services seeks compensatory and punitive damages, as well as attorney's fees and costs, and originally sought an injunction prohibiting the defendants from enforcing their suspension of Adoption Services' license. The defendants have filed a motion for summary judgment [Document # 21].

■ Having withdrawn its application for injunctive relief, Adoption Services concedes that this action may be dismissed with respect to Ragaglia, as she was sued only in her official capacity.[2] Adoption Services also concedes that this action may be dismissed with respect to Minetti and Pysh. See Pl.'s Mem. Opp. Mtn. Summ. J. at 2. The motion for summary judgment is therefore GRANTED absent objection as to those defendants. Consequently, Schultz is the only remaining defendant in this action. The motion for summary judgment is also GRANTED as to Schultz for the following reasons.

## I. Background[3]

Adoption Services was a child adoption agency licensed by DCF and the State of Connecticut.[4] As indicated, the defen-

---

1. Conn. Gen.Stat. § 4–182 provides in pertinent part:

 (c) No revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the institution of agency proceedings, the agency gave notice by mail to the licensees of facts or conduct which warrant the intended action, and the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license. If the agency finds that public health, safety or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. These proceedings shall be promptly instituted and determined.
 Conn. Gen.Stat. § 4–182.

2. A plaintiff cannot maintain a claim for damages against a defendant in her official capacity as a suit against a defendant in her official capacity is ultimately a suit against the state and thus is barred by the Eleventh Amendment. See Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

3. The following facts are based on the parties' Local Rule 9(c) Statements and other summary judgment papers and are undisputed unless otherwise indicated.

4. Conn. Gen.Stat. § 17a–149 requires that child placing agencies obtain a license from DCF:

 No person or entity except a parent, an adult relative as specified by section 17b–75 or guardian of any child shall place a child without a license obtained from the Commissioner of Children and Families. Application for a child-placing license shall be in a form furnished by the commissioner, and shall state the location of the principal place of business of the applicant, its organization or corporate name, its purposes and the name, title and degree of professional training of each of its staff members engaged in carrying out its stated purposes. Any such applicant shall consent to such inspection, review and supervision of all acts in relation to child placing as are reasonably necessary to enable the commissioner to perform his duties under section 17a–151.
 Conn. Gen.Stat. § 17a–149. Section 17a–151 provides for an issuance of a license to such person or entity after "investigat[ing] the conditions in each application under the provisions of section 17a–149 and, if the commissioner finds such conditions suitable for … the placing out of children, under such standards for the promotion of the health, safety, morality and well being of such children as he prescribes …." Conn. Gen.Stat. § 17a–151. Section 17a–151 also provides for the issuance of a "provisional license": "[If] the commission finds that the applicant, notwithstanding good faith efforts, is not able to fully comply with all the requirements he prescribes, but compliance can be achieved with minimal efforts, the commissioner may issue a provisional license for a period not to exceed sixty days. The provisional license may be renewed for additional sixty-day periods, but in no event shall the total of such periods be for longer than one year." Id.

dants were officials employed by DCF. Defendant Schultz, a licensed psychologist, was the DCF Director of the Division of Continuous Quality Improvement, which dealt with the licensing and regulation of child adoption agencies.

On June 23, 1998, defendant Schultz sent a letter to Adoption Services' Executive Director, Kenneth Keller ("Keller"), notifying him that DCF was refusing to renew Adoption Services' "regular license" and revoking a provisional license issued on February 23, 1998. The letter recited the following violations of the Regulations of Connecticut State Agencies ("Regulations") as reasons for such licensing actions:

1) failure/refusal to submit reports when requested by DCF pursuant to § 17a–150–71(a)(5),

2) failure/refusal/neglect to submit budget to DCF demonstrating ability to carry out stated purpose of program pursuant to § 17a–150–69(a),

3) failure/refusal/neglect to submit fee schedule to DCF pursuant to § 17a–150–69(b),

4) failure/refusal/neglect to identify the sources of income and demonstrate the ability to operate the program as a going concern pursuant to § 17a–150–69(c),

5) failure/refusal/neglect to provide annual audits to DCF pursuant to § 17a–150–69(f), and

6) failure/refusal/neglect to grant DCF access to all financial records pursuant to § 17a–150–69(g).

The letter also provided notice of Adoption Services' right to an administrative hearing. Adoption Services subsequently requested a hearing, and DCF stayed its decision not to renew the license and to revoke its provisional license.[5] DCF sent Adoption Services a notice of a hearing to be held on October 7 and 9, 1998. Adoption Services then requested a continuance of the hearing until December 1998, which was granted.

In October of 1998, the Commissioner of the Connecticut Department of Health wrote two letters to DCF, which were presented to Defendant Schultz, expressing concern about a child reportedly born at home on June 12, 1998, whose adoption was being handled by Adoption Services, and who had already been placed with adoptive parents. The commissioner's letters to DCF indicated that Adoption Services had failed to document the child's birth properly, that the nurse who had completed the "Birth History Report Form" on behalf of Adoption Services did not have the required personal knowledge of the birth, and that no birth certificate had been filed for the child. Defendant Schultz also received correspondence from the Ellington, Connecticut Town Clerk, who indicated that the signature of the child's biological father on the child's adoption papers, witnessed by Keller, did not appear to match the signature on the father's voter registration card, and the signature of the nurse who signed the birth history report also did not match her voter registration card. Keller also witnessed that signature. Defendant Schultz then ordered Lawrence Pysh, a DCF Facilities Inspector, to conduct an immediate on-site inspection of Adoption Services' records. However, on the date of the inspection, no one appeared at Adoption Services' office to admit Pysh because Adoption Services' owner-operators were on vacation in Aruba and claimed that they could not arrange for anyone else to meet Pysh.

Subsequently, on November 2, 1998, Pysh and DCF Facilities Inspector Robert

---

**5.** Section 17a–150–72 of the Regulations pro- vides for the issuance of such a stay.

F. Tebecio visited Adoption Services and inspected its records. Pysh and Tebecio then filed a field inspection report enumerating their findings, which in general, stated that Adoption Services' records failed to show adequate staff training, background checks on prospective parents, and medical information. In light of the information supplied to Schultz by Pysh and Tebecio, as well as the letters supplied by the Department of Health and Town of Ellington, Schultz gave notice to Adoption Services, in a letter dated November 4, 1998, that DCF was immediately suspending Adoption Services' license pursuant to § 17a–150–73 of the Regulations.[6] The letter stated that the suspension was due to a number of regulatory violations committed by Adoption Services, causing DCF to believe that the public health, safety, and welfare required emergency action. Several of the alleged regulatory violations stemmed from the adoption of the child mentioned above, including Adoption Services' failure to provide documentation of proof of pregnancy, proof of live birth, and a birth certificate, as well as problems with the child's birth history report. The letter also alleged other "serious regulatory violations observed by the DCF inspectors [at the November 2 visit]" and violations arising from Adoption Services' failure to grant DCF access to the premises on the first attempted on-site inspection.

The suspension went into effect immediately, notwithstanding the stay of the earlier DCF decisions not to renew Adoption Services' regular license and to revoke its provisional license. Adoption Services then requested a hearing on the suspension. A consolidated hearing on the licensing actions, including the license suspension, was scheduled for December 15 and 16, 1998. Adoption Services, through its counsel, requested a continuance of the hearing, and the hearing was scheduled for January 13, 27, and 29, 1999. On January 9, 1999, Adoption Services, again through counsel, withdrew its request for a hearing as it had gone out of business while the hearing date was pending. Adoption Services later filed this action claiming that the defendants' suspension of its license without a prior hearing violated Connecticut's Administrative Procedure Act, Conn. Gen.Stat. § 4–182, and deprived it of property without due process of law in violation of the United States Constitution.

The defendants have moved for summary judgment, alleging that there are no genuine issues of material fact that: (1) their actions did not violate Adoption Services' substantive or procedural due process rights; (2) the defendants did not have any personal involvement in the allegedly unlawful actions, as is required under § 1983; and (3) they are entitled to qualified immunity for their actions.

As noted earlier, Adoption Services does not oppose summary judgment as to defendants Ragaglia, Minetti, and Pysh, which leaves the motion as to defendant Schultz only.

## II. Standard

In the context of a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant

6. Regulation § 17a–150–73 provides:
 If the department finds that public health, safety, or welfare requires emergency action and incorporates a finding to that ef-

fect in its order, suspension of a license maybe ordered pending proceedings for revocation or other licensure action.
Conn. Agencies Regs. § 17a–150–73.

summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." *Miner v. City of Glens Falls,* 999 F.2d 655, 661 (2d Cir. 1993) (internal quotation marks and citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (internal quotation marks omitted), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"The nonmovant must do more than present evidence that is merely colorable, conclusory, or speculative and must present 'concrete evidence from which a reasonable juror could return a verdict in his favor.'" *Alteri v. General Motors Corp.,* 919 F.Supp. 92, 94–95 (N.D.N.Y.1996) (quoting *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505). A party may not create its own "genuine" issue of fact simply by presenting contradictory or unsupported statements. *See Securities & Exch. Comm'n v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present "significant probative evidence to create a genuine issue of material fact." *Soto v. Meachum,* Civ. No. B–90–270 (WWE), 1991 WL 218481, at *6 (D.Conn. Aug. 28, 1991).

In ruling on a motion for summary judgment, the Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991); *see also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992).

## III. Discussion

The Supreme Court of the United States has instructed that "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *County of Sacramento v. Lewis,* 523 U.S. 833, 842, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Accordingly, the Court must first determine whether the undisputed facts show that the defendant's actions deprived Adoption Services of any constitutional rights before considering the qualified immunity defense. *See Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

### A. Procedural Due Process

■ To succeed on a procedural due process claim, a plaintiff must establish (1) that he had a protected interest; (2) that the State deprived him of this interest; and (3) that the deprivation was effected without due process of law. *Local 342, Long Island Pub. Serv. Employees v. Town Bd. of Town of Huntington,* 31 F.3d 1191, 1194 (2d Cir.1994).

#### 1. Did Plaintiff Have a Protected Interest and Did the State Deprive it of That Interest?

■ Adoption Services claims it had a protected property interest in its license

to operate a child adoption agency, an interest created by Connecticut law. One's interest in a license issued by the State "may be a property interest cognizable by the Due Process Clause of the Constitution." *New York State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1311 (2d Cir.1994); *see Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) ("Once licenses are issued, . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses . . . involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."). If a plaintiff can assert "a legitimate claim of entitlement" to such license, a license affecting one's right to pursue an occupation may be "property" protected by the Due Process Clause. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see Schware v. Board of Bar Examiners*, 353 U.S. 232, 238–39, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) ("A State cannot exclude a person from . . . any . . . occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause[s] of the Fourteenth Amendment."). A claim of entitlement is "defined by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577, 92 S.Ct. 2701. In light of the statutory and regulatory framework limiting DCF's discretion to revoke, suspend, or otherwise limit child placing agency licenses, *see* Conn. Gen.Stat. §§ 17a–151 ("Any license issued under this section may be revoked, suspended or limited by the commissioner for cause . . . .") and Conn. Agencies Regs. §§ 17a–150–71 to 17a–150–73 (setting forth reasons for which adverse licensing action may be taken), it is clear that Adoption Services had such a claim of entitlement to its State-issued license to operate a child adoption agency. *See Barry v. Barchi*, 443 U.S. 55, 65, n. 11, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (stating that when a state license may only be revoked upon proof of certain contingencies, the license holder has a "legitimate claim of entitlement" protected by the Due Process Clause). It is also clear that defendant Schultz deprived Adoption Services of such interest when he suspended its license.

### 2. Was the Deprivation Effected Without Due Process?

■ Adoption Services' claim boils down to whether providing a post-deprivation hearing here satisfied the requirements of the Due Process Clause. "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge*, 424 U.S. 319, 348, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–172, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)). The Supreme Court has established that "[b]efore a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Roth*, 408 U.S. at 570 n. 7, 92 S.Ct. 2701 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)); *see Smith v. Organization of Foster Families*, 431 U.S. 816, 848, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Bell*, 402 U.S. at 542, 91 S.Ct. 1586. Even where a State's interests justify immediate action, a full hearing must be available promptly after the temporary deprivation occurs. *See Goldberg v. Kelly*, 397 U.S. 254, 266–

267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). "To be meaningful, an opportunity for a full hearing and determination must be afforded at least at a time when the potentially irreparable and substantial harm caused by a suspension can still be avoided-i.e., either before or immediately after suspension." *Barchi*, 443 U.S. at 74, 99 S.Ct. 2642 (Brennan, J., concurring in part).

■ The determination of what process is due before a deprivation of a right occurs, including whether a post-deprivation hearing is adequate, requires consideration of the now-familiar *Mathews v. Eldridge* factors: (1) the nature of the private interest affected by the State's action, (2) the State's interest, including the fiscal and administrative burdens that would be placed on it by additional procedures, and (3) the risk of erroneous deprivation of the private interest through the procedure used and the value of additional safeguards. *See Eldridge*, 424 U.S. at 335, 96 S.Ct. 893.

■ The private interest affected by the decision here is the license to operate the child adoption agency. Unlike the social security recipients in *Eldridge* who could be made whole by retroactive payments if their claims were sustained in a post-deprivation hearing, there may be circumstances where "a licensee is not made entirely whole if his suspension or revocation is later vacated." *Dixon v. Love*, 431 U.S. 105, 113, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977). The license to operate a child placement agency was important to Adoption Services and its employees for their economic well-being and reputational interests. Perhaps that interest is not as "vital and essential" as social insurance payments that are relied on for subsistence, *see Goldberg*, 397 U.S. at 264, 90 S.Ct. 1011, but it is nonetheless substantial. Moreover, even a temporary depriva-

tion most likely could not be completely remedied. *See Dixon*, 431 U.S. at 113, 97 S.Ct. 1723.

On the other hand, the State's interest in protecting the health and safety of its children in this context is paramount. The State has a significant interest in protecting children from harm by those charged with their care. *See Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (noting state's interest in protection of children); *Valmonte v. Bane*, 18 F.3d 992, 1003 (2d Cir.1994) (same). Placing very young children with adoptive parents and ensuring their well-being during that process and thereafter is an undertaking with the potential for serious harm. Here, there were not only safety concerns about the children, but questions about documenting the circumstances of their birth and the identities of their natural parents. The reliability of that information could be of critical importance to the adoptive parents, the children, and the government. Also, there were concerns about properly investigating the backgrounds of the adoptive parents; certainly their fitness for adopting a young child and confidence in their abilities and willingness to take proper care of the child are important concerns. The nature of the evidence presented to Schultz must also be given some weight. It included claims by the town clerk that birth documents may have been fraudulently prepared. Finally, immediate action was necessary not only to address the situation involving the particular child born in June, but also to prevent similar problems with other children in the process of adoption. The State has a considerable interest in ensuring the safety and appropriate procedures of a child adoption agency, and promptness in responding to such safety concerns can be very important, given the stakes involved. Certainly, there are situations involving

the adoption of children where immediate action by the State is necessitated by the facts presented, such as here.

As to the third factor of the inquiry, there existed some risk of erroneous deprivation in the suspension of Adoption Services' license prior to a hearing. Unlike the situation in *Dixon v. Love,* where the state suspended motor vehicle licenses based on "largely automatic" criteria, 431 U.S. at 113, 97 S.Ct. 1723, here there were subjective analyses of information. However, the information upon which Schultz concluded an immediate suspension was necessary had sufficient indicia of reliability, including the letters from a town clerk and the Connecticut Health Commissioner stating that Adoption Services had failed to adequately document the child's birth and a written, detailed inspection report by state officials. All of these sources were public officials, obligated to perform their duties in accordance with law. Although additional safeguards to ensure the accuracy of the information upon which Schultz acted were possible, the immediacy of the situation did not permit their use.

In sum, the Court finds that exceptional circumstances justified conducting the hearing after the suspension. Post-deprivation hearings have been found to satisfy due process where a prior hearing would have been inconsistent with "a countervailing ... interest of overriding significance," *Boddie,* 401 U.S. at 377, 91 S.Ct. 780, for example, where immediate action was required to safeguard public health. *See Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.,* 452 U.S. 264, 299–303, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (upholding the Surface Mining Control and Reclamation Act's pre-hearing mining cessation orders in light of environmental safety concerns); *Goss v. Lopez,* 419 U.S. 565, 582, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (stating that situations may ex-

ist where due process is satisfied although a student is removed from school without prior hearing, for example, where the student is dangerous or disruptive); *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 599–600, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (authorizing seizures of apparently misbranded, but physically harmless, drugs without prior hearing); *North American Cold Storage Co. v. City of Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (upholding the destruction of diseased poultry without prior hearing). Overriding public health concerns, comparable to those justifying post-deprivation hearings in the above-mentioned cases, were also present here.

■ Moreover, the post-suspension administrative review procedure provided by the State was available promptly after the deprivation occurred. It is undisputed that the defendants offered to hold a consolidated hearing on all actions taken with regard to Adoption Services' license on the dates originally scheduled for the hearing on the refusal to renew Adoption Services' regular license and revocation of his provisional license, December 15 and 16, 1998. On December 7, 1998, Adoption Services requested a continuance of this hearing, claiming that it could not put on a defense at that time because DCF had not yet given Adoption Services access to all of DCF's records regarding Adoption Services. On December 8, 1998, however, it is undisputed that DCF notified Adoption Services that all the requested records would be available to it on December 10, 1998, in advance of the December 15 and 16, 1998 hearing dates. Adoption Services did not withdraw its request for a continuance upon learning of the availability of the records, and thus, the hearing was then re-scheduled for January 13, 27, and 29, 1999.[7] The Court concludes that, by

---

7. Adoption Services does not argue that the original hearing dates of December 15 and 16

setting the hearing dates for December 15 and 16, 1998 and offering Adoption Services access to all relevant DCF records by December 10, 1998, DCF made available to Adoption Services a "prompt" hearing on the license suspension for purposes of the Due Process Clause.

Additionally, the Court finds that the post-deprivation administrative review procedure appears reasonably calculated to uncover and correct errors committed in suspending a license. The Uniform Administrative Procedure Act ("UAPA"), Conn. Gen.Stat. §§ 4–166 through 4–189i, details the procedure for the license suspension hearing. Under the UAPA, the hearing officer may "administer oaths, take testimony under the oath relative to the case, subpoena witnesses and require the production of records, physical evidence, papers and documents to any hearing . . . ." Conn. Gen.Stat. § 4–177b. Each party is entitled to present evidence and argument, cross-examine witnesses and inspect relevant documents in the possession of the parties. *See* Conn. Gen.Stat. § 4–177c. The UAPA requires that the agency "proceed with reasonable dispatch" and if it fails to do so, relief may be sought in the Superior Court. Conn. Gen.Stat. § 4–180. The UAPA also provides for an appeal to the Superior Court from the final administrative determination of the case. *See* Conn. Gen.Stat. § 4–183.

▆ On balance, the Court finds that the procedures offered to Adoption Services were adequate to satisfy the requirements of procedural due process. Though the suspension of Adoption Services' license impacts an important property interest, the State's interest in protecting children, the emergency circumstances surrounding the deprivation, and the

promptness and adequacy of the post-deprivation hearing compel a finding that Adoption Services was afforded adequate procedural due process.

Accordingly, the Court finds that the defendant's actions did not deprive Adoption Services of procedural due process as a matter of law.

## B. Substantive Due Process

▆ Adoption Services also claims that the defendant deprived it of the previously described property interest in a manner violating its right to substantive due process. To succeed on its substantive due process claim, Adoption Services must show that the government action was "arbitrary, conscience-shocking, or oppressive in a constitutional sense," and not merely "incorrect or ill-advised." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir.1995); *see also Lewis*, 523 U.S. at 846, 118 S.Ct. 1708 ("[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense.") (internal quotation marks omitted); *Natale v. Town of Ridgefield*, 170 F.3d 258, 262–63 (2d Cir. 1999) ("Substantive due process is an outer limit on the legitimacy of governmental action . . . . Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority."). As noted above, Adoption Services presented no evidence which suggests that defendant Schultz's actions were arbitrary, conscience-shocking, or outrageous. At most, assuming he erred in suspending Adoption Services' license, defendant Schultz's actions were "incorrect or ill-advised." This is insufficient for a trier of

---

were not "prompt" for due process analysis; rather, it claims that the failure to provide DCF records on a timely basis caused the

postponement to January, which caused Adoption Services to close.

fact to find a substantive due process violation.[8]

## C. Qualified Immunity

 Even assuming defendant Schultz's actions did deprive Adoption Services of its substantive and procedural due process rights, the defendant's actions are protected by the qualified immunity defense as a matter of law. The law of qualified immunity is well settled in the Second Circuit:

> Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial lawsuits. Government actors performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act. The objective reasonableness test is met-and the defendant is entitled to qualified immunity-if officers of reasonable competence could disagree on the legality of the defendant's actions.

*Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995) (citations and internal quotation marks omitted). Because qualified immunity is an affirmative defense, "the defendants bear the burden of showing that the challenged act was objectively reasonable

in light of the law existing at that time." *Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir.1997) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Accordingly, the defendants bear the "burden of demonstrating the nonexistence of a clearly established right or that it was reasonable, as a matter of law, for defendants to take the actions that plaintiff alleges they took." *Tellier v. Fields*, —— F.3d ——, ——, No. 98–2249, 2001 WL 457767, at *11 (2d Cir.2001). A plaintiff may overcome the defendant's qualified immunity "by showing that [the plaintiff's asserted] rights were clearly established at the time of the conduct at issue," *Davis v. Scherer*, 468 U.S. 183, 197, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), and that it was objectively unreasonable for the defendant to believe that he was acting in a manner that did not clearly violate such right(s).

In the context of a motion for summary judgment, a defendant is entitled to qualified immunity "when no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon*, 66 F.3d at 420 (emphasis added and internal quotation marks omitted); *see also Behrens v. Pelletier*, 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (indicating that qualified immunity is an entitlement not to stand trial or face the burdens of litigation).

### 1. Violation of a Clearly Established Right

 In determining whether a particular right was clearly established at the

---

**8.** As the Court finds that the defendant did not violate Adoption Services' constitutional rights, the Court need not address the defendant's claim that he lacked personal involvement under § 1983.

time a defendant acted, a court must consider three factors: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).

■ Adoption Services claims it had a right to a hearing prior to the suspension of its license to operate a child adoption agency under the circumstances here. As is evident by the Court's earlier conclusions regarding Adoption Services' rights, the Court finds that the defendant has met his burden in demonstrating the nonexistence of any decisions by the U.S. Supreme Court or the U.S. Court of Appeals for the Second Circuit recognizing Adoption Services' right in this context or "defin[ing] the contours of the right with reasonable specificity." *Russell v. Coughlin,* 910 F.2d 75, 78 (2d Cir.1990). The Court is aware of no case law holding that, when there is substantial evidence to believe that the safety of adoptive children and parents is at risk, timely post-deprivation hearings like the one available to Adoption Services to challenge its license suspension are insufficient to satisfy due process.[9] Thus, this Court concludes that this right is not sufficiently clear to overcome the

defendant's qualified immunity defense, and the defendant is entitled to the defense of qualified immunity as a matter of law.

### 2. Objectively Reasonable Action

Even assuming defendant Schultz violated a clearly established federal right of Adoption Services, Adoption Services has failed to establish that defendant Schultz's actions were objectively unreasonable. While Adoption Services contends that "there was no conceivable emergency," the Court finds, as noted earlier, that the information provided to the defendant indicated that immediate action was necessary. *See Doe v. Conn. Dep't Children & Youth Servs.,* 712 F.Supp. 277, 286–87 (D.Conn. 1989) (indicating that the possibility there was no wrongdoing must give way to protection of a child where a reasonable basis exists for the belief that such protection is necessary), *aff'd,* 911 F.2d 868 (2d Cir. 1990).

Consequently, in light of the information given to defendant Schultz, his steps to investigate that information, the availability of an administrative hearing to challenge his actions, and the purpose of qualified immunity to protect state officials from lawsuits challenging their decisions where they have a reasonable basis for those decisions, the Court concludes that defendant Schultz's actions were objectively reasonable. No reasonable official in his position would have understood that his actions were unlawful. Therefore, defen-

---

**9.** The Court is aware of Second Circuit precedent in the context of "what steps State officials were constitutionally forbidden to take in seeking to protect children from alleged abuse," specifically, the holding that state officials may not "effect a child's removal [from parental custody] on an 'emergency' basis where there is reasonable time safely to obtain judicial authorization consistent with the child's safety." *Tenenbaum v. Williams,* 193

F.3d 581, 596 (2d Cir.1999). However, *Tenenbaum* is distinguishable from the instant case, as *Tenenbaum* involved parents' due process rights to a hearing prior to interference with a liberty interest in the care and custody of their child, rather than a child adoption facility's right to a hearing prior to interference with a property interest in its license.

dant Schultz is entitled to a defense of qualified immunity.

## IV. Remaining State Law Claims

The Court further declines to exercise supplemental jurisdiction over Adoption Services' Connecticut Administrative Procedure Act claim on the ground that it has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *Spear v. Town of West Hartford,* 771 F.Supp. 521, 530 (D.Conn.1991) ("[A]bsent unusual circumstances, the court would abuse its discretion were it to retain jurisdiction of the pendant state law claims on the basis of a federal question claim already disposed of . . . ."), *aff'd,* 954 F.2d 63 (2d Cir.), *cert. denied,* 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992).

## V. Conclusion

For the preceding reasons, the defendants' motion for summary judgment [Document # 21] is GRANTED and the case is DISMISSED.